**In re TRANS WORLD AIRLINES, INC., Debtor.**

**TRANS WORLD AIRLINES, INC., Plaintiff,**

**and**

**Official Unsecured Creditors' Committee, Plaintiff–Intervenor,**

v.

**TRAVELLERS INTERNATIONAL AG., Defendant.**

**Bankruptcy No. 92–115.
Adv. No. A–92–28.**

United States Bankruptcy Court,
D. Delaware.

Nov. 30, 1994.

William H. Sudell, Jr., Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, David S. Kurtz, Michael J. Templeton, Jones, Day, Reavis & Pogue, New York City, for plaintiff Trans World Airlines, Inc.

Laura Davis Jones, Young, Conaway, Stargatt & Taylor, Wilmington, DE, James E. Spiotto, E. Anthony Lauerman, III, Chapman and Cutler, Chicago, IL, for Official Unsecured Creditors' Committee.

Laurie Selber Silverstein, Potter, Anderson & Corroon, Wilmington, DE, Michael Joseph, Richard A. Kirby, Joseph O. Click, Dyer, Ellis, Joseph & Mills, Washington, DC, for Travellers Intern. AG.

## OPINION

PETER J. WALSH, Bankruptcy Judge.

### *INTRODUCTION*

TWA filed its Chapter 11 petition on January 31, 1992. TWA served as debtor-in-possession during the entire case, and its second amended plan of reorganization (the "Plan") was confirmed on August 11, 1993, effective November 3, 1993. TWA commenced this adversary proceeding on March 10, 1992 (the "Adversary Proceeding"). On June 23, 1992, the Court authorized the Official Unsecured Creditors Committee to intervene as a party plaintiff. This is the court opinion following trial of the Adversary Proceeding.

Prior to TWA's Chapter 11 case, Travellers had filed a breach of contract action against TWA. Following a trial in the United States District Court for the Southern District of New York (the "District Court"), judgment was entered on October 22, 1991 against TWA and in favor of Travellers in the amount of $12,318,242 plus interest. On October 31, 1991, TWA and Travellers entered into a Stipulation and Order on Consent (the "Stipulation"). In summary, the Stipulation (a) continued the Fed.R.Civ.P. 62(a) stay of execution of judgment until November 4, 1991, (b) provided that by November 4, 1991, TWA could either post a supersedeas bond in the amount of

$13,693,101,[1] or deposit that amount of cash with the clerk of the District Court, which bond or cash would serve as security for TWA's payment of the judgment and interest, and (c) Travellers agreed that, upon the posting of the bond or cash, execution upon the judgment would be stayed during the pendency of TWA's appeal. On November 4, 1991, TWA deposited cash in the amount of $13,693,101 with the clerk of the District Court. TWA filed a notice of appeal on November 19, 1991. The appeal is still pending. With the filing of TWA's Chapter 11 petition on January 31, 1992, the prosecution of the appeal was stayed by 11 U.S.C. § 362(a)[2] and Travellers has not requested relief from the stay to permit the appeal to proceed.

By the Adversary Proceeding, pursuant to §§ 547 and 550, TWA seeks to avoid and recover the cash deposit as a preferential transfer made to Travellers.[3] Since TWA filed its Chapter 11 petition on January 31, 1992, the 90 day preference period reaches back to include transactions which occurred on and after November 2, 1991. In the alternative, pursuant to § 542(a), TWA seeks to obtain turnover of the funds alleged to belong to the estate.[4]

Of the five elements needed to establish a § 547(b) preference, Travellers argues that two are lacking here. According to Travellers, (a) the transfer occurred before November 2, 1991 and (b) TWA was not insolvent when the transfer occurred on October 31, 1991. Alternatively, Travellers argues that it is entitled to an equitable lien which overrides the avoidance power of the trustee under § 547(b). In addition, Travellers relies upon the § 547(c)(1) contemporaneous exchange for new value exception. In Part I of this opinion, following a statement of the facts relating to the Stipulation, I address the issues of (a) when the transfer occurred, (b) whether an equitable lien exists and (c) whether there was a contemporaneous exchange for new value. The insolvency issue will then be separately addressed in Part II.

Because I find that the transfer occurred on November 4, 1991, and that TWA was insolvent on that date, the transfer is avoidable as a preference pursuant to § 547(b). Furthermore, because I find that Travellers does not hold an equitable lien on the depos-

---

1. As explained below, the difference between the $12,318,242 judgment and $13,693,101 set forth in the Stipulation reflects (a) a recalculation of the judgment amount and (b) an 11% interest factor as called for by the local rules of the District Court for the Southern District of New York.

2. Hereinafter all citations to 11 U.S.C. § ___ are referred to as "§ ___".

3. Section 547(b) provides:

    Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made—
    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b) (West 1993).
    Section 550(a) provides:
    Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    (2) any immediate or mediate transferee of such initial transferee.
11 U.S.C. § 550(a) (West 1993).

4. Section 542(a) provides:

    Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.
11 U.S.C. § 542(a) (West 1993).

ited cash and that the deposited cash was not a contemporaneous exchange for new value, the transfer is not excepted from the provisions of § 547(b) and § 550.[5]

## PART I

### FACTS REGARDING STIPULATION

Following the District Court's entry of judgment against TWA on October 22, 1991, trial counsel for TWA and trial counsel for Travellers commenced extensive oral and written communications which culminated in the entry of the Stipulation on October 31, 1991. These communications essentially concerned (1) a correction to the amount of the judgment, (2) disagreement as to the expiration of the 10 day automatic stay of execution provided by Fed.R.Civ.P. 62(a)[6] and (3) the protection of Travellers' interest pending an anticipated appeal by TWA.

Both counsel recognized the need to recalculate the October 22, 1991 judgment amount to reflect the proper interest rate. Travellers' counsel performed a recalculation of the judgment amount from $12,318,242 to $12,336,127.41 and communicated it to TWA's counsel who confirmed its correctness. Because of counsels' differing views of the application of Fed.R.Civ.P. 62(a), they disagreed as to when the 10–day automatic stay period expired—with TWA asserting November 6, 1991 and Travellers asserting November 1, 1991. Counsel compromised by agreeing that the 10–day stay remained in effect until 11:59 p.m. on November 4, 1991.

The third issue—Travellers' execution rights and protection pending an anticipated TWA appeal—dominated counsels' communications leading up to the Stipulation. Pursuant to Fed.R.Civ.P. 62(d), TWA could simply post a supersedeas bond with the clerk of the District Court to obtain a stay pending appeal. However, TWA wanted the right to make a cash deposit with the clerk rather than post a bond. Making a cash deposit rather than posting a bond requires a court order, but such orders are routinely granted on request.

On October 25, 1991, TWA's counsel faxed to Travellers' counsel a discussion draft of a stipulation addressing the three issues. As to Travellers' protection, that draft provided as follows:

2. On or before 5:00 p.m. on November 4, 1991, Defendant Trans World Airlines, Inc. ("TWA") if it does not provided [sic] a supersedeas bond, *shall* deposit the sum of $13,673,249.64, by wire transfer or by cash or certified check, with the Clerk of this Court in lieu of a supersedeas bond, said sum reflecting the total amount of the judgment in favor of Plaintiffs and an additional 11% of said judgment as additional security; [emphasis added].

Travellers' counsel made extensive revisions to the draft and faxed it back to TWA's counsel on October 29, 1991. According to Travellers' counsel, for grammatical purity, he changed the word "shall" to "may" in the above quoted paragraph 2. In addition, among other changes, Travellers' counsel added a paragraph 6 which read as follows:

6. If TWA provides the Cash Deposit to the Clerk of the Court for deposit in the CRIS account, in order to secure payment of the judgment, post-judgment interest and costs, *TWA hereby grants a security interest to Travellers in the Cash Deposit* in the total amount of the judgment, post-judgment interest and costs. [emphasis added].

The proposed paragraph 6 specifically purported to grant a security interest to Travellers. TWA's counsel rejected this paragraph and it was deleted from the final version of the Stipulation.

During the communications leading to the Stipulation, a further issue regarding the stay provision arose. Travellers' counsel was concerned that a failure on his part to record the judgment with the clerk of court in New York County and elsewhere might constitute

---

5. Because I find that the cash deposit is recoverable by TWA as a preferential transfer, I do not address TWA's alternative § 542(a) turnover request.

6. In pertinent part, Fed.R.Civ.P. 62(a) provides:

Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry.
Fed.R.Civ.P. 62(a).

professional malpractice. He expressed the view to TWA's counsel that such a recording would not violate the stay of Fed.R.Civ.P. 62. In his October 29, 1991 return draft, Travellers' counsel included a provision directed to this issue which read as follows:

7. Upon payment of applicable fees, if any, the Clerk of the Court is directed on or after the date of this Stipulation and Order (i) to provide a transcript of the judgment to counsel for Travellers so that Travellers can record the judgment in counties in New York and (ii) to certify the judgment for registration in other districts and to take any other action necessary to allow Travellers to register the judgment in other districts pursuant to 28 U.S.C. § 1963, good cause for such registration having been shown, so that Travellers can take the necessary steps to record the judgment in districts other than New York.

TWA's counsel objected to this provision, asserting that a recordation would constitute an act in enforcement of the judgment within the contemplation of Fed.R.Civ.P. 62. The parties resolved this issue by deleting the above quoted paragraph 7 but, at the request of Travellers' counsel, advising the District Court judge in the letter transmitting the final form of the Stipulation that this was an open issue between the parties and it might be presented to the judge for resolution at a later time.

Travellers' counsel advised TWA's counsel that he wished to obtain from the District Court clerk a transcript of the judgment so he could record it in the New York County clerk's office as well as other places. Travellers' counsel hoped to obtain a lien on TWA property by recording the judgment. He cited to TWA's counsel a number of cases which he believed supported Travellers' position that such recording was not a step in the enforcement of the judgment. TWA's counsel took a contrary view, asserting that any such recordation would constitute a step in the enforcement of the judgment. He advised Travellers' counsel that if Travellers' counsel took steps to record the judgment, TWA would move to have him held in contempt for violation of the stay.

Sometime during the course of this debate, Travellers' counsel communicated with the clerk of the District Court. The clerk advised that it was his interpretation of Fed.R.Civ.P. 62(a) that giving TWA a transcript of the judgment would be a step in enforcement of the judgment and therefore such a transcript would be given only if the District Court judge ordered it to be given.

According to Travellers' counsel, the parties reached what he characterized as a "day to day agreement" that Travellers would forbear from going to the judge to seek such an order. He testified that Travellers' forbearance was based on the continuing debate on the recordation issue and on his belief that the issue would be mooted by what he perceived as a "promise" by TWA to post cash to obtain a stay. TWA's counsel denied that there was any forbearance agreement or promise by TWA. According to him, the only agreement by Travellers was that it would not seek such an order from the judge without appropriate notice to TWA's counsel. In any event, viewing the testimony in Travellers' favor, it is to the effect that (a) the "agreement" was not to forbear from recording the judgment, but to forbear from seeking an order from the judge allowing such recording, and (b) the forbearance was not in exchange for a commitment by TWA in the Stipulation to post cash because the "day to day agreement" was in effect before the parties signed the Stipulation.

Counsel signed the Stipulation on October 30, 1991, and TWA's counsel delivered it with a transmittal letter to the District Court judge, who signed it on Thursday, October 31, 1991. In its entirety, the Stipulation is as follows:

WHEREAS, a judgment for plaintiff Travellers International AG ("Travellers") in this action in the sum of $12,318,242.92 was entered on this Court's docket on October 22, 1991; and

WHEREAS, the parties agree that the proper calculation of pre-judgment interest until the judgment was entered results in a total sum of $12,336,127.41 and that the judgment should be amended to state that amount and entered *nunc pro tunc* as of October 22, 1991; and

WHEREAS, the parties wish to establish and agree upon their respective rights and obligations with respect to the judgment, execution thereon and stays thereof, and the time for defendant Trans World Airlines, Inc. ("TWA") to file a bond or other security pending appeal;

IT IS HEREBY STIPULATED AND AGREED THAT:

1. The proper calculation of the judgment is $12,336,127.41. The Clerk of the Court is directed to enter judgment for that amount, attached here as Exhibit A, *nunc pro tunc*, as of October 22, 1991.

2. The automatic stay of proceedings to enforce a judgment provided by Fed. R.Civ.P. 62(a) shall remain in effect until 11:59 p.m. on Nov. 4, 1991.

3. On or before 5:00 p.m. on November 4, 1991, defendant, if it does not provide a supersedeas bond in the amount of $13,-693,101.42, may deposit the sum of $13,-693,101.42 (the "Cash Deposit"), by wire transfer or by cash or certified check, with the Clerk of this Court in lieu of a supersedeas bond.

4. The sum TWA provides, whether by supersedeas bond or Cash Deposit, reflects the total amount of the judgment in favor of Travellers and an additional 11% of said judgment and is provided by TWA as security to secure payment to Travellers of the judgment, post-judgment interest and costs, should Travellers prevail on appeal and be held entitled to same in whole or in part.

5. If TWA elects to provide the Cash Deposit as set forth in paragraph 3 above, the Clerk of the Court is directed to deposit the Cash Deposit in the interest-bearing Court Registry Investment System ("CRIS") account, and all interest accruing on the Cash Deposit shall be paid to TWA on a quarterly basis.

6. Upon receipt by the Clerk of the Court of the aforementioned supersedeas bond or Cash Deposit from TWA, Travellers is stayed from executing on all or any part of the judgment entered in this action pending the hearing and determination of TWA's appeal. If the time for TWA to take an appeal from the judgment entered in this action expires without TWA having done so, the stay granted herein shall expire concurrently.

On Monday, November 4, 1991, TWA transferred by wire a cash deposit of $13,693,101 to the clerk of the District Court.

TWA claims that it is the November 4, 1991 wire transfer of $13,693,101 which constitutes the § 547(b)(4)(A) transfer. Travellers claims that the transfer took place on October 31, 1991 when the parties entered into the Stipulation. Travellers' position rests on the argument that the Stipulation was a security agreement as contemplated by N.Y.U.C.C. § 9–105(1) (McKinney 1992 Supp.) which took effect October 31, 1991 and which, pursuant to N.Y.U.C.C. § 9–304(1) and § 9–305, became perfected by the wire transfer of funds on November 4, 1991. Alternatively, Travellers argues that (a) it has an equitable lien on the deposited funds, or (b) the deposited funds were in exchange for new value.

### *DISCUSSION*

*The Stipulation as a Security Agreement*

Briefly stated, Travellers' argument is as follows:

1. The central focus is on paragraph 4 of the Stipulation. It states that "[t]he sum TWA provides, whether by supersedeas bond or Cash Deposit, ... is provided by TWA as security to secure payment to Travellers of the judgment...." This language is consistent with that of the U.C.C. which defines the term "security interest" as "an interest in personal property ... which secures payment ... of an obligation" N.Y.U.C.C. § 1–201(37) (McKinney 1992 Supp.). Thus, according to Travellers, the Stipulation is a security agreement because it is an agreement "which creates or provides for a security interest." *Id.* § 9–105(1)(c).

2. A security interest attaches when (1) the debtor has signed a security agreement describing the collateral, (2) value has been given; and (3) the debtor has rights in the collateral. N.Y.U.C.C. 9–203(1)(a)(b)(c) (McKinney 1992 Supp.) According to Travellers: (1) TWA signed the Stipulation/security agreement which described collateral as

the cash that TWA would deposit with the clerk; (2) Travellers gave value to TWA in the form of (a) a stay of execution, (b) the option of depositing cash in lieu of posting a bond, (c) the right to collect interest on the funds deposited, and (d) the right to obtain a stay of execution pending appeal before filing its notice of appeal, thereby giving TWA an additional 20 days within which it could file a notice of appeal without subjecting itself to execution of the judgment, and (3) TWA had rights in the collateral because it had sufficient cash (in excess of $377,000,000) to make a cash deposit of $13,693,101.42 at the time it signed the Stipulation. Travellers therefore argues that its security interest attached on October 30 when the parties signed the Stipulation.

■ 3. Section 547(e)(2)(A)[7] provides that "a transfer is made ... at the time such transfer takes effect between the transferor and transferee, if such transfer is perfected at, or within 10 days after, such time." A security interest in money can be perfected by a third party, such as the clerk, taking possession of the money. N.Y.U.C.C. §§ 9–304(1) and 9–305 (McKinney 1992). Travellers argues that its security interest provided by the Stipulation was perfected when TWA deposited funds with the clerk.

For the reasons set forth below, I find that the Stipulation lacks essential elements needed to effect an attachment of a security interest.

■ There is no security agreement unless the parties so intend. 2 *White & Somers Uniform Commercial Code* § 24–3 (3d ed. 1988).[8] A number of provisions and terms of the Stipulation cause me to conclude that the parties did not so intend.

1. The Stipulation does not state that TWA "is hereby granting a security interest" or that TWA "shall" make a deposit of cash with the clerk. On the contrary, it provides that if TWA does not provide a supersedeas bond it *may* make a cash deposit.

2. The third "whereas" clause of the Stipulation recites that one of the purposes of the Stipulation is to "establish and agree upon ... the *time* for [TWA] to file a bond or other security pending appeal." (emphasis added) That recited purpose is inconsistent with Travellers' claim that the "security" was given upon execution of the Stipulation, since the Stipulation expressly establishes the "time" as November 4, 1991.

3. Paragraph 4 of the Stipulation is entirely consistent with the security arrangement contemplated by Fed.R.Civ.P. 62. The bond or cash deposit was to be security for Travellers' judgment "should Travellers prevail on appeal and be held entitled to same in whole or in part." If TWA elected not to appeal, there was obviously no reason why it would elect to provide security to extend the stay provided by Rule 62.

4. Paragraph 6 of the Stipulation provides that upon receipt by the clerk of the bond or the deposit of cash, Travellers is stayed from executing on the judgment pending appeal. The converse of this is implicit: if no bond is posted or no deposit of cash is made, then there would be no stay of Travellers' right to execute on the judgment. Except for the Cash Deposit alternative to a bond, this is exactly what is contemplated by Fed.R.Civ.P. 62, because the judgment holders' benefit from Rule 62 is triggered upon the furnishing of security to the clerk.

---

7. Section 547(e)(2)(A) provides:
> (2) For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—
> > (A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;
>
> 11 U.S.C. § 547(e)(2)(A) (West 1993).

8. *White & Somers* suggest that in making a determination of the existence of a security agreement two separate inquiries are involved, first, a question of law as to whether the language embodied in the writing objectively indicates an intent to provide for a security interest, and second, a question of fact as to whether the parties actually intended a security agreement. In problem cases, parol evidence is admissible as to the second inquiry, but not the first. 2 *White & Somers Uniform Commercial Code* § 24–3 (3d ed. 1988). Over TWA's objection I permitted parol evidence on this issue. Ironically, that evidence supports TWA's position. For the reasons set forth herein, I find for TWA on both the legal and the factual inquiry.

5. "Absent possession of the collateral by the secured party, a security interest is not enforceable against the debtor ... unless ... the debtor has signed a security agreement which contains a description of the collateral." N.Y.U.C.C. § 9–203(1)(a) (McKinney 1990). The Stipulation does not contain a description of existing collateral. It merely specifies two possible methods whereby collateral would be created if TWA elected to have a stay pending appeal—by (a) TWA depositing cash with the clerk, or (b) TWA providing a bond to the clerk. Travellers' argument that the collateral existed on October 31, 1991 because on that date TWA had cash of in excess of $377,000,000 is unavailing. The Stipulation does not say that the "security" is the sum of $13,693,101 which at that time was a part of TWA's cash holdings. Nor does the Stipulation specify a bank account or other source from which TWA would create the Cash Deposit, or grant Travellers' rights in such source. By definition "Cash Deposit" did not exist until the deposit occurred on November 4, 1991.

6. Paragraph 5 of the Stipulation provides that the clerk is required to put the Cash Deposit in an interest bearing account "[i ]f TWA *elects* to provide the Cash Deposit as set forth in paragraph 3 above,...." [Emphasis added.] If TWA had instead elected to post a bond as collateral, the bond/collateral was not in existence on October 31, 1991.[9] Therefore, TWA had no rights in the bond/collateral at that time and Travellers' interest could not attach to the bond/collateral. Section 547(e)(3) provides that a transfer is not made until the debtor has acquired rights in the property. Since TWA never purchased a bond, there was never a transfer of an interest in the bond.

Since the Cash Deposit was a substitute for the bond and it did not come into existence until it was created on November 4 by TWA making a deposit of cash, a transfer did not occur until that date.

7. A security interest does not attach "until it becomes enforceable against the debtor with respect to the collateral." N.Y.U.C.C. § 9–203(2) (McKinney 1992). Prior to November 4, 1991, Travellers did not have enforcement rights against the "collateral" as the collateral did not exist. It certainly had no enforcement rights in a non-existing bond or cash in TWA's bank account. The Stipulation contemplated that if no bond or cash deposit was posted, there would be no stay and Travellers could execute on its judgment. It would be unnecessary for Travellers to take action to execute on its judgment if it already had a lien on the "collateral." Under the circumstances, the conclusion seems inescapable that no security interest attached until TWA made the deposit with the clerk on November 4, 1991.[10]

■ 8. "Perfection" of a security interest within the contemplation of U.C.C. § 9–303 is typically effected by an act performed by the creditor, e.g., filing a security statement. Travellers notes that "debtors frequently transfer a security interest in property, conditioned upon the subsequent perfection of that interest by the *creditor*." Def.Reply Br. 10. (emphasis added) However, the act which purports to effect perfection here is an act performed by the debtor. More importantly, it is an act which was optional on the part of the debtor. For purposes. of § 547(e)(2)(A), I conclude that "perfection" does not include an act performed by the debtor within its discretion.[11]

---

9. Travellers ignores the existence of TWA's posting a bond as an alternative to depositing cash. For example, it argues that "[i]t is beyond cavil that paragraph 4, which states that 'the sum TWA provides ... is provided by TWA as security ...,' created a security interest for the benefit of Travellers in the money that TWA would later deposit with the clerk." Def.Br. 3. Travellers quotation from paragraph 4, omits the words "whether by supersedeas bond or Cash Deposit" following the phrase "the sum TWA provides."

10. While pointing out that he is not an expert in this area of the law, Travellers' counsel testified

that he did not know whether the Stipulation gave collateral that TWA could foreclose on had the deposit of cash not been made on November 4, 1991. Tr. 503. He further testified that had the deposit not been made he would have recorded the judgment and sought to execute thereon. Tr. 501–02.

11. This is consistent with § 362(b)(3) which excepts from the automatic stay acts of a *creditor* in perfecting a security interest within the 10 day period.

Within the four corners of the Stipulation document, I find no significant indicia that the parties intended a security agreement. The Stipulation does contain a slim reed of support for Travellers' position. Travellers points to the specific language of paragraph 4 that "[t]he sum TWA provides, whether by supersedeas bond or Cash Deposit, ... is provided by TWA as security to secure payment to Travellers of the judgment ..." Travellers focuses on the present tense of the statement and on the term "security." These two factors do little to outweigh the impact of the items discussed above. Furthermore, if one resorts to matters outside the four corners of the document, the conclusion is even more compelling that the parties did not intend a security agreement. I therefore address matters outside the four corners of the document.

By his October 29, 1991 draft of the Stipulation, Travellers' counsel specifically requested TWA's counsel to include a paragraph which recited that "TWA hereby grants a security interest to Travellers in the Cash Deposit." This request was rejected and Travellers' proposed paragraph was deleted in the next draft of the document.[12] If Travellers' counsel believed that the term "security" in paragraph 4 of the Stipulation was the granting of a security interest, why did he seek to add a paragraph which provided that "TWA hereby grants a security interest?" Having sought to insert language which purportedly would have achieved a desired result, it seems incongruous for Travellers to argue that the result was achieved in the absence of the proposed language.

TWA's counsel testified that the purpose of the Stipulation, in addition to resolving the Fed.R.Civ.P. 62(a) 10 day timing issue and correcting the amount of the judgment, was to simply obtain an order authorizing the clerk to accept a cash deposit in lieu of a supersedeas bond to avoid a lot of unnecessary motion practice. TWA's counsel's understanding of the Stipulation was that it did not require TWA to either post a bond or make a cash deposit unless it wanted to continue the stay of execution; he never intended or understood the Stipulation to grant Travellers a security interest. His understanding of the reference to "security" in paragraph 4 of the Stipulation was a reference to Fed.R.Civ.P. 62 which uses the terms "bond or other security". On the other hand, Travellers' counsel testified on direct examination that he believed the Stipulation was designed to "grant to Travellers a security interest that was going to be perfected by the posting of cash to follow." Tr. 478. However, he subsequently testified on cross examination that if TWA did not want a stay it was not required to either post a bond or deposit the cash.[13] In this regard, Travellers' counsel's testimony is consistent with TWA's counsel's understanding of the purpose of the Stipulation.

In the October 30, 1991 transmittal letter by TWA's counsel to the District Court judge, counsel stated that the parties were requesting that the judge approve the Stipulation "so that the parties may take the appropriate steps, including provision for security pending appeal." PX 22, p. 2. Such language speaks in terms of prospective acts, i.e., the posting of security with the clerk on or before November 4, 1991, rather than in

---

12. TWA's counsel testified:

I called [Travellers' counsel] to discuss my position on several provisions that were in [the October 29] draft, not just the paragraph numbered 6. With respect to number 6, I specifically and point-blank stated we would not agree to this. I told him that if TWA put up a supersedeas bond, if TWA put up—if it wanted to extend the automatic stay, if it put up cash or wire transfer in lieu of the supersedeas bond, then Travellers had whatever rights it had under the law upon putting up the bond or the cash.

Tr. 59–60.

13. Travellers' counsel testified:
  Q. The stipulation says that if TWA does not provide a supersedeas bond, they may do something else, right?
  A. Yes.
  Q. But they're not required to do that something else, are they?
  A. If they don't want a stay, they're not required to do either one of them ...
Tr. 484.
Notwithstanding its witness' testimony, Travellers asserts that "it is ... unarguable that TWA's execution of the agreement was a commitment by TWA to transfer that security interest," Def.Reply Br. 3.

terms of a security interest having already been granted upon the signing on October 30th or, being effective upon approval by the judge. The quoted language in the letter was reviewed by Travellers' counsel prior to the letter being delivered to the judge.

In summary, since TWA had the option to provide security on or before November 4, 1991, the Stipulation was not a security agreement, i.e., "an agreement which creates or provides for a security interest." It merely established a procedure whereby, if TWA so elected, it would provide security to Travellers pending the appeal. If TWA elected not to provide security, in the form of a bond or the Cash Deposit, it exposed itself to the risk of a judgment creditor's execution rights. Travellers' interest in the Cash Deposit is therefore no different than that of any other judgment creditor in cash deposited, in lieu of a bond, with a clerk to stay execution pending appeal. *See, Pan Am. World Airways, Inc. v. Care Travel Co. Ltd. (In re Pan Am. Corp.)*, 138 B.R. 382 (Bankr. S.D.N.Y.1992), *aff'd in part*, 166 B.R. 538 (S.D.N.Y.1993); *In re Thomson McKinnon Sec. Inc.*, 125 B.R. 94 (Bankr.S.D.N.Y.1991). That interest is created by operation of Fed. R.Civ.P. 62 and for Travellers it came into existence on November 4, 1991.

The fact that Travellers expected TWA to appeal and therefore to post security, and that TWA stated that it anticipated taking an appeal and posting security, does not negate the fact that by the terms of the Stipulation and in accordance with the understanding of both counsel, TWA was not obligated to do either.

Both parties cite to the court a number of escrow account cases, Travellers to demonstrate language which creates a security interest and TWA to demonstrate that the transfer occurs upon the physical transfer of the funds. I do not find these cases helpful in resolving the issue here. TWA cites *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). The Supreme

Court's reasoning in *Barnhill*, a case arising under Article 3 of the U.C.C., is applicable here by analogy. There the Court held that the date of transfer for perfection purposes was not when the check was delivered to the creditor outside the preference period, but on the later date inside the preference period when the debtor's bank honored the check. *Barnhill* rejected the notion that an interest passed from the debtor to the creditor when the check was delivered.

> Petitioner argues that the Court of Appeals erred in ignoring the interest that passed from the debtor to the petitioner when the check was delivered on a date outside the 90–day preference period. We disagree. We begin by noting that there can be no assertion that an unconditional transfer of the debtor's interest in property had occurred before November 20. This is because, as just noted above, receipt of a check gives the recipient no right in the funds held by the bank on the drawer's account. Myriad events can intervene between delivery and presentment of the check that would result in the check being dishonored. The drawer could choose to close the account. A third party could obtain a lien against the account by garnishment or other proceedings.

*Id.* at 399, 112 S.Ct. at 1390.

I similarly reject the notion that an interest transferred when the parties signed the Stipulation. Before TWA created the Cash Deposit on November 4, 1991, it could have transferred all or substantially all of its cash to another creditor or creditors, or, some other judgment or lien creditor or creditors could have seized the cash through appropriate attachment proceedings.[14] Travellers dismisses the relevance of *Barnhill* on the grounds that a check is not like a security agreement. Of course, that position begs the question by assuming that the Stipulation is a security agreement.

Travellers argues that the § 101(58)[15] definition of "transfer" includes a "conditional"

---

14. At the time of the Stipulation, it was a matter of public knowledge that TWA was in material default on hundreds of millions of dollars of secured and unsecured debt.

15. Section 101(58) provides:
  "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including

transfer and paragraph 4 of the Stipulation may fairly be read as transferring to Travellers a security interest "conditioned" on TWA posting cash by November 4. Since this condition was in fact fulfilled, Travellers argues that the transfer can be said to have occurred on October 31, 1991. The court in *Barnhill* rejected the same argument.

> [P]etitioner retreats to the definition of "transfer" contained in § 101[58]. Petitioner urges that rather than viewing the transaction as involving two distinct actions—delivery of the check, with no interest in property thereby being transferred, and honoring of the check, with an interest being transferred—that we instead should view delivery of the check as a "conditional" transfer. We acknowledge that § 101[58] adopts an expansive definition of transfer, one that includes "every mode ... absolute or conditional ... of disposing of or parting with property or with an interest in property." There is thus some force in petitioner's claim that he did, in fact, gain something when he received the check. But at most, what petitioner gained was a chose in action against the debtor. Such a right, however, cannot fairly be characterized as a conditional right to "property or an interest in property," § 101[58], where the property in this case is the account maintained with the drawee bank. For as noted above, until the moment of honor the debtor retains full control over disposition of the account and the account remains subject to a variety of actions by third parties. To treat petitioner's nebulous right to bring suit as a "conditional transfer" of the property would accomplish a near-limitless expansion of the term "conditional." In the absence of any right against the bank or the account, we think the fairer description is that petitioner had received no interest in debtor's property, not that his interest was "conditional."

*Barnhill*, 503 U.S. at 400–01, 112 S.Ct. at 1390–91.

Finally, the conclusion which I have recited above, that on the facts here § 547(e)(2)(A) does not create an earlier transfer date, seems entirely consistent with the conclusion of the Court in *Barnhill* as to the application of § 547(e)(2)(A) to the facts there.

> Finally, we note that our conclusion that no transfer of property occurs until the time of honor is consistent with § 547(e)(2)(A). That section provides that a transfer occurs at the time the transfer "takes effect between the transferor and the transferee...." For the reasons given above, and in particular because the debtor in this case retained the ability to stop payment on the check until the very last, we do not think that the transfer of funds in this case can be said to have "taken effect between the debtor and petitioner" until the moment of honor.

*Barnhill*, 503 U.S. at 401, 112 S.Ct. at 1391.

*Equitable Lien*

■ Absent a UCC Article 9 security agreement, Travellers argues that it has an equitable lien on the deposited funds. According to Travellers, New York law permits the imposition of an equitable lien where, as here, according to Travellers, a debtor and creditor agree, expressly or by implication, that certain property will be maintained as security for the debtor's obligation to the creditor. In support of its position, Travellers relies principally upon five cases. *Security Pac. Mortgage & Real Estate Serv., Inc. v. Republic of Philippines*, 962 F.2d 204, 208 (2d Cir.1992); *In re Gebco Inv. Corp.*, 641 F.2d 143, 146 (3d Cir.1981); *F.W. Eversley & Co. Inc. v. East N.Y. Non-Profit HDFC, Inc.*, 409 F.Supp. 791, 799 (S.D.N.Y.1976); *G.L. Wilson Bldg. Co. v. Leatherwood*, 268 F.Supp. 609, 621 (W.D.N.C.1967); *James v. Alberton Dock Yards, Ltd.*, 256 N.Y. 298, 176 N.E. 401 (1931), *rearg. denied*, 256 N.Y. 681, 177 N.E. 191 (1931). I find none of the cases factually apposite. Four of the five cases involved creditors who performed construction or maintenance work on real estate owned or managed by the defendant(s). *See,*

---

retention of title as a security interest and foreclosure of the debtor's equity of redemption.

11 U.S.C. § 101(58) (West 1993).

*Security Pacific,* 962 F.2d at 207; *Gebco,* 641 F.2d at 145; *Eversley,* 409 F.Supp. at 793; *Wilson,* 268 F.Supp. at 610. In two of the five cases equitable liens were not imposed. *See, Security Pacific,* 962 F.2d at 208–10 and *James,* 176 N.E. at 403–04. In those cases in which the courts found for the creditors on equitable theories, the court also found that the defendant(s) would be unjustly enriched because the creditors performed work with the expectation of payment. *See, Gebco,* 641 F.2d at 146, 147, 148–49 (funds earmarked for benefit of subcontractor); *Eversley,* 409 F.Supp. at 795–97 (plaintiff led to expect payment and defendant's past practices induced plaintiff's participation); *Wilson,* 268 F.Supp. at 615, 621–22 (defendants promised on a number of occasions that payments would be forthcoming).

To align itself with these cases, Travellers claims that the Stipulation evidenced the parties' intention that TWA would convey funds as security for the judgment pending appeal and that Travellers relied on the funds' existence to its detriment by refraining from establishing alternative security in the form of a judicial lien. Travellers articulates its equitable lien position in its post-trial brief as follows:

> Travellers refrained from obtaining a judicial lien on or before November 1 *only* because TWA represented that it would deposit the cash on November 4.[16] Thus if the stipulation had not been executed and if TWA had not assured Travellers that security would in fact be posted, Travellers would, *before the beginning of the preference period,* have *obtained a judicial lien* on property sufficient to satisfy its judgment. . . .
>
> By promising to establish a fund to provide security for the judgment, TWA induced Travellers to surrender this alternative security. Under these circumstances, the law creates an equitable lien in favor of Travellers. That equitable lien came into

existence at the time of the conduct giving rise to its imposition, *i.e.,* when TWA induced Travellers to forego creation of a judicial lien.

Def.Br. 16 (emphasis added).

■ Travellers' argument is not supported by facts. First, as already discussed, I conclude that TWA did not promise to post a bond or create the Cash Deposit. It merely agreed that if it wished to take an appeal and wished to have a stay of execution pending the appeal, it would post a bond or create the Cash Deposit.[17] Travellers was justified in expecting the deposit to be made by November 4, 1991. However, mere expectation of payment is insufficient to establish an equitable lien. *Security Pacific,* 962 F.2d at 208. Second, Travellers did not refrain from obtaining a judicial lien prior to the preference period because of TWA's alleged promise to make a cash deposit. It was barred from doing so by Fed.R.Civ.P. 62(a). To resolve a conflict as to how to interpret that Rule, the Stipulation specified that the Rule's automatic 10 day stay would not expire until 11:59 P.M. on November 4, 1991.

Travellers' claim that there was some type of "day to day agreement" for Travellers to forbear is an amorphous argument. Accepting Travellers' version, the testimony is that (a) the clerk of the District Court advised that he deemed the issuance of the judgment transcript as a step in the enforcement of the judgment, that such a step was barred by Fed.R.Civ.P. 62(a), and that no such transcript would be given absent a court order; (b) the forbearance "agreement" was not to forbear from recording the judgment but from seeking an order from the judge allowing a recording; and (c) the forbearance was not in exchange for a commitment by TWA in the Stipulation to post cash because the forbearance agreement was in effect before the parties signed the Stipulation. Thus, even assuming there was such an agreement to forebear, it was not tied to the Stipulation.

---

16. Presumably, the November 1 date is Travellers' calculation of the commencement of the 90–day preference period. According to my calculation, the preference period commenced on November 2, 1991.

17. While claiming that Travellers' forbearance was in some fashion based on TWA's counsel's "assurance" that TWA was going to post cash, Travellers' counsel repeated that TWA's posting of security was optional: "TWA was going to post cash or a bond if they wanted a stay." Tr. 487.

Even if Travellers had sought such an order from the judge, there is no basis on which to conclude that it would have been granted. Absent proof that Travellers was entitled to such an order as a matter of law, I cannot conclude that Travellers was prejudiced by refraining from seeking it. Finally, Travellers offered no evidence as to what property would be liened even if the order were granted and the judgment transcript recorded with the clerk for New York County and elsewhere. The recordation could create a lien only against TWA real property, and Travellers offered no evidence as to the existence of TWA real property in such locations or to whether the lien would have sufficient priority to give ·value to Travellers' interest. Of course, the recordation could not create a lien on personal property, including TWA's purported cash position of $377,000,000, absent an attachment proceeding. Any such proceeding would have violated Fed.R.Civ.P. 62(a). Thus, even assuming the existence of such a forbearance agreement, I conclude that Travellers did not rely upon it to its detriment and find no basis to impose an equitable lien in favor of Travellers.

Travellers also relies upon *Sexton v. Kessler & Co.*, 172 F. 535, 543 (2d Cir.1909), *aff'd*, 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995 (1912) and *Pine Top Ins. Co. v. Century*

*Indemn. Co.*, 123 B.R. 287 (N.D.Ill.1990). These cases are not on point. *Sexton* was decided in 1912 and has been superseded by subsequent legislation. *See* James Wm. Moore, *Collier on Bankruptcy* ¶ 60.38 at 951 (14th ed. 1977) ("the elimination of the doctrine of *Sexton v. Kessler* accomplished by the 1938 Act, has been carried forward in the 1950 Amendment"). In any event, *Sexton* held only that a creditor had an equitable lien on "specific identified stocks and bonds" which the debtor had segregated for the creditor and placed in "escrow" in a safety deposit vault. *Sexton*, 225 U.S. at 98, 32 S.Ct. at 659. The Court found that those actions "purported not to promise, but to *transfer*" an "absolute *present* right" to the securities. *Id.* (emphasis added). Travellers had no "absolute and present right" to any particular TWA property until at least November 4, 1991. Thus, *Sexton* does not support Travellers' argument for an earlier transfer. Similarly, the decision in *Pine Top* is neither persuasive or apposite, as it relies on *Sexton*, 123 B.R. at 295–96, and involved identified collateral which all parties understood was to serve as full security for the transaction, *id.* at 289, 297.[18]

*Contemporaneous Exchange for New Value*

■ Travellers argues that the cash deposit was a contemporaneous exchange for new value and therefore the transfer is ex-

---

**18.** I believe there is serious doubt as to whether an equitable lien theory applied to a transaction otherwise governed by U.C.C. Article 9 is cognizable in a § 547 action. Section 60(a)(6) of the old Bankruptcy Act, 11 U.S.C. § 60(a)(6), was enacted in 1950 to avoid a resurrection of the pre–1938 (Chandler Act) cases which recognized equitable liens and in turn immunized them from the trustee's preference attack under § 60(a)(6) of the Act. *See generally, In re Washington Communications Group, Inc.*, 10 B.R. 676, 679 (Bankr.D.D.C.1981). In *Matter of Einoder*, 55 B.R. 319, 328 (Bankr.N.D.Ill.1985), the court reasoned that although § 60(a)(6) was not included in the Bankruptcy Reform Act of 1978 it maintained its approval through the Gilmore Committee Report on the Code, see H.R.Rep. No. 595, 95th Cong., 1st Sess. 209, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, which stated that § 60(a)(6) was no longer necessary because Article 9 of the UCC had "turned the 'equitable liens' against which § 60(a)(6) was directed into 'unperfected security interests' which the trustee can in any case set aside", *see* U.C.C. § 9–301(3) (1984). The Seventh Circuit has held that equi-

table liens are contrary to the policy of bankruptcy law. *Small v. Beverly Bank*, 936 F.2d 945, 949 (7th Cir.1991). I note, however, that in *Lewis v. Diethorn*, 893 F.2d 648 (3d Cir.), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990), where the court held that a settlement of a law suit was not a preference transaction because there was a contemporaneous exchange of new value, the court also found that the creditor had an equitable lien under Pennsylvania law. Of course, like the cases cited by Travellers, *Lewis* involved a creditor who made improvements to real property and the equitable lien was invoked to avoid unjust enrichment to the debtor. *Id.* 936 F.2d at 950–51. I do not believe that *Lewis* is authority for invoking an equitable lien theory to a disputed transaction otherwise governed by both U.C.C. Article 9 and specific provisions of the Bankruptcy Code. In any event, because I find that the facts here clearly do not warrant the finding of an equitable lien, I need not decide whether an equitable lien theory is cognizable in the context of a § 547 action.

cepted under § 547(c)(1).[19] Pursuant to § 547(g), Travellers has the burden of proof in establishing a subsection (c) exception.

According to Travellers, the cash transfer was in performance of the obligation that TWA incurred by the Stipulation, *not* on account of the underlying judgment. Focussing on the § 547(a)(2) definition of "new value," which includes a "release by a transferee of property previously transferred to such transferee," Travellers argues that pursuant to the Stipulation it released its right to obtain a judicial lien for the amount of its judgment in exchange for the Cash Deposit.

Travellers' new value exception argument suffers from the same defects as its equitable lien argument. TWA never obligated itself to create the Cash Deposit. Only if it wanted a stay of execution after November 4, 1991 was it obligated to post a bond or make the deposit of cash. It could elect to do neither. Furthermore, Travellers did not release its right to obtain a judicial lien for the amount of the judgment in exchange for the alleged promise of a Cash Deposit. As noted in the discussion of Travellers' equitable lien argument, *supra*, there was no forbearance to obtain a judicial lien and, even assuming there was some type of forbearance, it was not the forbearance of a right which had any demonstrable value.

Even if it were supported by the facts, Travellers new value argument fails as a matter of law. A creditor's forbearance from levying on a judgment was found not to constitute "new value" under § 547(a)(2) in *In re Thomson McKinnon Sec. Inc.*, 125 B.R. 94 (Bankr.S.D.N.Y.1991). That court relied on the Eleventh Circuit's statement that "[f]orbearance from exercising pre-existing rights does not constitute new value," *see In re Air Conditioning Inc. of Stuart*, 845 F.2d 293, 298 (11th Cir.), *cert. denied, sub nom.* 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988), to hold that the plaintiffs' forbearance

from levying on a judgment against a defendant/debtor did not create "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred." *McKinnon*, 125 B.R. at 97. In *McKinnon*, the plaintiffs had deferred levying on the defendant's assets in expectation of the defendant's posting a cash deposit with the clerk of court to obtain a stay of execution pending appeal, which the defendant did two days prior to filing for bankruptcy. *Id.* The court reasoned that the plaintiffs' forbearance did not enhance the value of the debtor's estate, as the debtors' right to appeal the judgment "was not an asset for the benefit of its creditors that could reasonably offset the diminution of its estate upon the execution of the judgment." *Id.*

Other courts have similarly held that the new value exception applies only where "new value" given to the debtor replenishes the estate for the value removed by the transfer, and thus does not apply to the forbearance from exercising a previously existing right against the debtor. *See e.g., Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153 (D.C.Cir.1986) (forbearance from exercising right to cancel debtor's insurance coverage not "new value"); *Jones v. Society Bank & Trust (In re Riggs)*, 129 B.R. 494, 496 (Bankr.S.D.Ohio 1991) (creditor's forbearance of its preexisting right to repossess collateral following debtor's default, in exchange for permitting debtor to cure default, not "new value"); *In re Alithochrome Corp.*, 53 B.R. 906, 913 (Bankr.S.D.N.Y.1985) (creditor's forbearance from enforcing a judgment as part of an out-of-court settlement not "new value").[20]

Furthermore, the Third Circuit has held that the party claiming that new value was contemporaneously exchanged must prove the specific measure of the new value given to the debtor in the exchange, reasoning that the language "money or money's worth in

---

**19.** Section 547(c)(1) provides:
(1) to the extent that such transfer was
  (A) intended by the debtor and the creditor *to or for whose benefit such transfer was made* to be a contemporaneous exchange for new value given to the debtor; and
  (B) in fact a substantially contemporaneous exchange;

11 U.S.C. § 547(c)(1) (West 1993).

**20.** I do not address the string citation of cases which Travellers sets forth in its post-trial brief on this issue. None of them support the proposition which Travellers fosters.

goods, services, or new credit" necessarily requires a specific dollar valuation of the "new value". *In re Spada (Creditors' Committee v. Spada)*, 903 F.2d 971, 976 (3d Cir. 1990). Even assuming Travellers had given something to TWA which could constitute "new value", Travellers has presented no evidence as to its "specific dollar valuation". *See id.*

### PART II—INSOLVENCY

Section 547(b)(3) requires that to avoid the transfer TWA must have been insolvent on November 4, 1991, the date of the transfer. Although § 547(f) creates a presumption of insolvency for the 90 day preference period, once the creditor puts in evidence to rebut that presumption, which Travellers did in this case, the burden of proving insolvency rests with the debtor. *In re Total Technical Servs., Inc. (Total Technical Servs., Inc. v. Whitworth)*, 150 B.R. 893, 899 (Bankr.D.Del.1993), citing *In re Old World Cone Co.*, 119 B.R. 473, 477–78 (Bankr. E.D.Pa.1990) and 4 *Collier on Bankruptcy* ¶ 547.06, at 547–38 to 547–39 (15th ed. 1991). *See also,* Notes of Committee on the Judiciary, S.Rep. No. 989, 95th Cong., 2d Sess. 89

(1978), *reprinted at* 1978 U.S.C.C.A.N. 5787, 5875; H.R.Rep. No. 595, 95th Cong., 2d Sess. 375 (1977), *reprinted at* 1978 U.S.C.C.A.N. 6331. The debtor must prove insolvency by a preponderance of the evidence. *See, e.g., In re OEM Indus. Corp. (OEM Indus. Corp. v. Birmingham Square)*, 148 B.R. 436, 438 (Bankr.W.D.Pa.1992); *Old World Cone Co.*, 119 B.R. at 478. Section 101(32)(A) defines insolvency of a corporate debtor as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation".

The parties are poles apart on the issue of insolvency, with TWA claiming that the aggregate debts exceeded the property value by $2,342,686, while Travellers claims that the property value exceeded the aggregate debts by $1,749,174. For purposes of the insolvency analysis, both parties use TWA's October 31, 1991 balance sheet as a reference point. Both parties agree that between October 31, 1991 and November 4, 1991 no measurable changes occurred in the nature or value of assets and liabilities. Compared to TWA's balance sheet as of October 31, 1991 the parties positions are as follows as to the TWA assets and liabilities:

| | 10/31/91 Balance Sheet (000) | TWA's Values (000)[21] | Travellers' Values (000) |
| --- | --- | --- | --- |
| Assets | $2,924,187 | $2,561,366 | $6,707,143 |
| Liabilities | 3,480,762 | 4,904,052 | 4,957,969 |
| (Deficit) or Surplus | (556,575) | (2,342,686) | 1,749,174 |

While there are substantial differences between the parties on the amount of debts, the principal difference between the parties is the value of assets. I will therefore address the asset valuation issue first.

### ASSET VALUATION
*The Valuation Standard*

The central issue here is what is meant by the term "at fair valuation" in

§ 101(32). The parties agree that the asset valuation is not based on a foreclosure or auction sale scenarios. The parties agree that the valuation should be done on a "going concern" basis. The conflict arises because Travellers argues that TWA's approach is actually a liquidation valuation, not a going concern valuation. TWA, in turn, argues that Travellers' approach is a theoretical valuation which does not address the reality of

**21.** TWA presented a range of values. These figures represent the midpoints of the range.

converting non-cash assets into cash in order to pay creditors.

The parties agree that for a § 101(32) insolvency analysis, balance sheet numbers do not necessarily reflect the fair value of assets. Indeed, with limited exceptions, e.g., cash and cash equivalents, balance sheet asset numbers do not in fact reflect the fair value of the assets. Furthermore, there are some assets of substantial value which are not even listed on the asset side of TWA's balance sheet. Thus, the balance sheet is merely a starting point for the analysis.[22] From the balance sheet listing of assets each party made adjustments, additions and deletions based on the expert testimony of their respective appraisers and accountants.

Each party presented reports and testimony by aviation industry valuation experts as to the value of TWA's operating assets. TWA's expert was Avmark Inc. ("Avmark"); Travellers' expert was Global Aviation Associates, Ltd. ("Global"). Generally speaking, TWA's expert values were based on the assumption that the categories of assets would be converted to cash over a 12 to 18 month period. Travellers' expert opined as to the present, i.e., November 4, 1991, fair value of the assets without offering an opinion as to how long it might take for TWA to sell a particular asset or particular categories of assets to convert them to cash to pay creditors. In other words, Travellers' expert focused on the value of the assets "in place" to TWA.

As presented in its opening post-trial brief, Travellers states its criticism of TWA's approach as follows:

> Based on a clipped quotation from *Collier on Bankruptcy*, TWA says the "fair value" of its assets is the amount that it would receive if its assets were converted to cash over a reasonable time.... TWA

further perverts this general statement by asserting that "fair value" should reflect two unwarranted and unsupportable assumptions. First, TWA contends that the fair-value standard requires its assets to be "converted to cash" in a hypothetical sale (*i.e.*, liquidation) of all assets that can be "sold." Second, TWA asserts that this sale must occur within a reasonable time, which TWA arbitrarily sets at 12 to 18 months.

> Neither assumption is legitimate, and both are inconsistent with the requirement that assets be valued from the perspective of a going concern.

Def.Br. 45.

In support of its position that to determine fair value one need not determine the cash that would be realized if assets were actually sold, Travellers quotes from the leading bankruptcy law authority as follows:

> Negatively, it can be stated on the one hand that the statutory definition does not imply that a person can only be deemed solvent at a particular time when the amount which he or his creditors would be able to *actually obtain* at the time is sufficient to pay all his debts then existing. Otherwise the controlling test would possess greater stringency than the one applicable under the traditional equity concept of insolvency, a result which the framers of the clause definitely intended to obviate. Rather, the underlying policy requires disregard of, and allowances for, unavoidable sacrifices or other adverse effects caused by the particular distress of the debtor. Accordingly, *"saleable value and fair value are not synonymous."* (Footnotes omitted.)

---

**22.** Section 101(32) is often referred to as the "balance sheet" test of insolvency to distinguish it from the equity test, i.e., the inability to pay debts as they mature. *See generally, In re Bellanca Aircraft Corp. (Bergquist v. Anderson–Greenwood Aviation Corp.),* 56 B.R. 339, 384–85 (Bankr.D.Minn.1985); 4 Collier on Bankruptcy ¶ 547.26 at 547–94 (15th ed. 1983). To label it a "balance sheet" test may be a misnomer. Financial statements prepared in accordance with Generally Accepted Accounting Principles

("GAAP") do not record assets at fair market value. Instead, they are recorded at the historical, original purchase cost and reduced each year by an estimate of depreciation. Within the contemplation of § 101(32) "property" may include assets not even listed on the balance sheet. Debts are recorded only to the extent they are known and quantifiable; many nonrecorded liabilities usually surface in an insolvency analysis. As demonstrated herein, the balance sheet is only the starting point in the analysis.

2 *Collier on Bankruptcy* ¶ 101.32 at 101–106 (15th ed. 1992) (emphasis added by Travellers).

Travellers also asserts that numerous authorities cited by *Colliers* and elsewhere establish that the concept of reasonable time in the various formulations of the term "fair value" does no more than refer to the lack of any time constraint or other compulsion to sell.

In response to this position, TWA quotes from *Collier* as follows:

> In general [fair valuation] ... will signify the reasonable estimate of what can be realized from the assets by converting them into, or reducing them to cash, under carefully guarded if not idealized conditions....

and

> ... direct[s] the estimate of what can be realized out of the assets within a reasonable time either through collection or sale at the regular market value, conceiving the latter as the amount that could be obtained for the property in question within such period by a "capable and diligent business man" from an interested buyer "who is willing to purchase under the ordinary selling conditions." (Footnotes omitted.)

2 *Collier on Bankruptcy* ¶ 101.32 at 101–106 and 101–108 (15th ed. 1992).

Thus, TWA argues that the valuation does require a determination of the amount of cash that can be realized from the assets and, according to TWA, Travellers' lack of any time constraint has the effect of reading out of the proposition a reasonable period of time and substituting a no time concept which results in theoretical values unrelated to the realities of the debtor's position in the industry.

Each party is able to quote *Collier* in support of their conflicting positions because *Collier's* discussion of insolvency includes an amalgamation of cases running back over the last 90 years and the cases are not all consistent. *See generally,* 2 *Collier on Bankruptcy* ¶ 101.32 at 101–105 through 101–117 (15th ed. 1994). The conflicting quotes from *Collier* arise not only from not well articulated reformulations of the insolvency test, but from the application of the test to broadly disparate fact situations. In addition, the very old cases were decided in a commercial context which has little resemblance to that of today. Finally, the value of cases decided before the 1934 introduction of the reorganization concept into non-railroad bankruptcy law, must be viewed with some degree of caution.

Before discussing some of the most often cited cases on "going concern" valuation of assets, I start by comparing the Code definition of "insolvency" with the former Bankruptcy Act's definition of "insolvency". In relevant part, § 101(32)(A) defines an insolvent corporate debtor as one whose "financial condition [is] such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." In relevant part, § 1(19) of the Act states that "a person shall be deemed insolvent ... whenever the aggregate of his property ... shall not at a fair valuation be sufficient in amount to pay his debts." Despite the language change, there is nothing in the legislative history of the Code to suggest that Congress intended to change the meaning of "insolvent" from that found in the Act, and pre-Code cases continue to be relied upon.

*Collier* refers to the "overwhelming authority" which calls for a going concern valuation, absent a "deathbed" situation. 2 *Collier on Bankruptcy,* ¶ 101.32 at 101–115 to 101–116 (15th ed. 1994). I briefly examine four of *Collier's* authorities. These are cases which are frequently cited for the "going concern" proposition.[23]

1. In *Chicago Title & Trust Co. v. John A. Roebling's Sons Co.,* 107 F. 71 (C.C.N.D.Ill.1901), the court found no error

---

23. Many of the cases cited by *Collier* contain no meaningful discussion of the "going concern" concept. *See In re Bucyrus Road Machinery Co.,* 10 F.2d 333 (6th Cir.1926); *Meyer v. Dolan,* 145 F.2d 880 (2d Cir.1944) *cert. denied,* 324 U.S. 867, 65 S.Ct. 916, 89 L.Ed. 1422 (1945); *In re Reading Hotel Corp.,* 10 F.Supp. 470 (D.Pa.1935); *In re Gibson Hotels,* 24 F.Supp. 859 (D.W.Va.1938); *Dabney v. Chase Nat'l Bank of the City of New York,* 196 F.2d 668 (2d Cir.1952) *cert. dismissed,* 346 U.S. 863, 74 S.Ct. 102, 98 L.Ed. 374 (1953). Only the cases containing a meaningful discussion of the concept are examined herein.

in a master's report which concluded that a judgment creditor did not obtain a preference when it caused execution on its judgment by a sheriff's sale. The sheriff's sale destroyed the value of the debtor's manufacturing plant as a going concern and the court found that for purposes of the insolvency test the debtor's property should be valued as a going concern before the sheriff's sale. The opinion does not disclose how the master arrived at the going concern value, although the going concern value precise figure of $41,473.19 suggests that it might have simply been a book value figure.

2. In *Rutland County Nat. Bank v. Graves,* 156 F. 168 (D.Vt.1907), the court rejected the finding of a referee that the debtor intended a preferential transfer. At the time of the transfer an individual debtor was operating a business and also held a substantial receivable from a lumber mill company. After the transfer, the lumber mill was destroyed by fire and the mill property was uninsured. This was the immediate cause of the debtor's bankruptcy. The referee equated the fair value of the debtor's property to the amount it brought in a bankrupt auction sale and assumed the receivable from the lumber company was worthless. Not surprisingly, the court rejected the referee's determination, concluding that the pre-petition going concern value of the debtor's property, not the bankrupt auction sale, was the test for insolvency on the date of the transfer.

3. In *In Re Nathanson Bros. Co.,* 64 F.2d 912 (6th Cir.1933), the court affirmed a master's finding of solvency which resulted in the dismissal of an involuntary petition. The court approved of the master's going concern valuation but the brief opinion contains no discussion of the master's determination. The opinion does set forth a statement, subsequently quoted in other opinions, as to what going concern value means, namely:

> Doubtless the underlying principle of going concern value is that an additional element of value attaches to property, considered in the aggregate, by reason of its having been assembled for the conduct of the given business and its fitness for such use. We do not think that the financial outlook of the debtor corporation, or the intention of its stockholders and directors to continue business or to liquidate at an early date, is determinative of the question. If the business is in fact being conducted at the time of alleged bankruptcy, then the items of property constituting its assets must receive a fair valuation, not as isolated articles separated from the whole, but as parts of the whole and as useful in that relationship. This is all that is meant by going concern value.

*Id.* at 913. I find this often quoted going concern value explanation not helpful for present purposes. Indeed, I am puzzled by the suggestion that "the financial outlook of the debtor corporation" is not determinative of the question.

4. In *In re Ouellette,* 98 F.Supp. 941 (D.Me.1951), the court affirmed the referee's finding of insolvency based on an expert appraiser's opinion as to the value of the debtor's inventory versus the debtor's argument that the inventory should be valued on the basis of a higher cost figure. The expert's opinion was based on what he believed a willing buyer would pay for the debtor's store, including inventory, to take it over and operate it. The opinion does not use the term "going concern" but does define "fair value" as follows:

> "Fair value" is not the valuation that would prevail at a sheriff's sale, sacrifice, or forced sale, nor is it the value to one person or another specially circumstanced. "Fair value" means such a price as a capable and intelligent business man could presently obtain for the property from a ready and willing buyer accustomed to buying such property. Such a value will depend upon many circumstances, such as age and condition of the stock, the state of trade, location of the business, the existence of a lease, and many other things. See *Stern v. Paper,* D.C. 1910, 183 F. 228. No one factor alone is conclusive.

*Id.* at 943.

I find *Collier's* case citations on "going concern" value for insolvency purposes not very enlightening in attempting to understand Travellers' position. As to the pre-1934 cases, it may be argued that the courts

were merely saying that since insolvency was to be tested as of a pre-petition date; the bankruptcy status, with the resulting forced liquidation sale, was not to be considered. This is clearly what the court was saying in *Rutland County Nat. Bank, supra.* The only point I find clearly established by these cases is that fair valuation does not imply a foreclosure, auction or distress sale.

I turn next to an examination of four cases relied upon by Travellers for the proposition that an asset's fair value does not involve a conversion to cash through a sale with a time constraint.[24]

1. In *Syracuse Engineering Co. v. Haight,* 110 F.2d 468 (2d Cir.1940), the court affirmed the district court's finding of insolvency where the principal contested issue was how to value the individual debtor's interest in a trust. Because the decision involved unique state law and insurance law issues regarding the trust and the debtor's projected stream of income from the trust, its discussion of the facts is not helpful here. The court stated the law as to fair valuation as follows:

> Fair valuation of an estate such as this might conceivably be based on forced sale prices, or on fair market prices, or on so-called intrinsic values, irrespective of sale. A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard. Bonbright and Pickett, Valuation to Determine Solvency under the Bankruptcy Act, 29 Col.L.Rev. 582, 597, 598; 1 Collier on Bankruptcy (14th Ed.1940) 74–81, collecting cases. It involves a value that can be made available for payment of debts *within a reasonable period of time.*

*Id.,* at 471 (emphasis added). Contrary to Travellers' argument, the case expressly states that a value estimate contemplates converting assets to cash to pay debts within a reasonable period of time.

2. In *Duncan v. Landis,* 106 F. 839 (3d Cir.1901), the court reversed a jury finding of insolvency because it found the trial judge's instruction on the issue to be in error. In the jury instructions, the trial judge advised that in determining what a purchaser would pay for the property the jury should consider the debtor's "[financial] situation, and the number and amounts of obligations owing by her, the time when they were due, which, of course, are elements regarded by the purchaser." *Id.* at 858. The appellate court found the instruction to be in error because it suggested that the purchaser can take advantage of the necessities and embarrassments of the debtor. The opinion contains what I believe to be conflicting language, suggesting that a fair value determination does not require a sale of the property, while also commenting that such value may be sufficient to pay the debts, even if the debtor "might not be able to realize at once the amount of that valuation." *Id.* at 859. The pertinent portion of the opinion is as follows:

> We think that the present market value of the property in question would be a fair valuation of the same, but there is nothing in this section of the act that authorizes that market value to be ascertained by what a purchaser would give who desired to take advantage of the necessities and embarrassments of the owner, in order to procure the same at a price less than its real or market value. We think the words above quoted from the charge of the court below which we have italicized have no place in an explanation of what is the criterion of a fair valuation. *Lawrence v. City of Boston,* 119 Mass. 126; *Dwight v. Commissioners,* 11 Cush. 201; *Railroad Co. v. Doughty,* 22 N.J.Law, 495; *Murray v. Stanton,* 99 Mass. 348. Again, the act expressly says that a man shall be deemed insolvent only when the aggregate of his

24. Many of the cases cited by Travellers contain no significant discussion of the fair valuation concept. *See Covey v. Commercial Nat. Bank of Peoria,* 960 F.2d 657, 660 (7th Cir.1992); *Foley v. Briden (In re Arrowhead Gardens, Inc.),* 32 B.R. 296, 299 (Bankr.D.Mass.1983), aff'd, 776 F.2d 379, 382 (1st Cir.1985); *Energy Co-op., Inc. v. Cities Serv. Co., (In re Energy Co-op., Inc.),* 109 B.R. 822, 824 (N.D.Ill.1989); *Murphy v. Valencia (In Re Duque Rodriguez),* 75 B.R. 829, 831 (Bankr.S.D.Fla.1987); *DeRosa v. Buildex, Inc. (In re F & S Cent. Mfg. Corp.),* 53 B.R. 842, 849 (Bankr.E.D.N.Y.1985). Only the cases containing a significant discussion of the concept are examined herein.

property, at a fair valuation, shall not be sufficient to pay his debts; but the court below gives an unwarranted construction to this definition, by adding to the plain meaning of a "fair valuation" the requirement that the debtor must be able to realize from his property a sufficient amount to pay his debts. This seems to us to clearly depart from the plain requirements of the statute, by adding a condition not therein set forth. *A man's property, at a fair valuation, may amount to sufficient to pay his debts, although he might not be able to realize at once the amount of that valuation.* In these two respects, we think the charge of the court, under this provision of the statute, misleading, and calculated to place the debtor in a harder situation than was intended by the statute. *Id.* at 858–59 (emphasis added). Some may argue that *Duncan* stands for the proposition that a fair valuation determination does not require a conversion of the property into cash within any particular time frame. As I read the case, it simply stands for the proposition that fair value is not determined on the basis of a distress sale.

3. In *In re Art Shirt*, 93 B.R. 333 (E.D.Pa.1988), the court affirmed the bankruptcy court's finding of insolvency in a trustee's preference action. The decision is principally devoted to the issue of the inclusion of a pension plan withdrawal liability as a debt of the estate. The limited discussion of the valuation of assets I find not particularly instructive. The creditor claimed that the bankruptcy court failed to value the assets on a going concern basis. The district court agreed, stating that "[b]efore the going concern valuation is to be abandoned, the business must be 'wholly inoperative, defunct or dead on its feet.'" *Id.* at 341. Because it found that the accounts receivable had to be reduced by $417,000, the inventory by $249,-000, the physical assets by $57,000, and that the liabilities (other than the pension liability) had to be increased by $120,000, the court

concluded that the debtor did not deserve to be valued as a going concern. This reasoning seems to suggest that the going concern label is a conclusion to be drawn from the numbers determinations, rather than vice versa.

4. In *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir.1992), the court affirmed the district court's finding that a leveraged buy-out a year and a half prior to the bankruptcy filing did not constitute a fraudulent conveyance and that the debtor was solvent at the time of the conveyance. The buyer paid $12.1 million for a company with a long history of profitable operations. The profitability continued immediately after the leveraged buy-out. However, the company's financial condition began to deteriorate approximately ten months before the bankruptcy petition. Sales fell off dramatically, inventory built up, cash flow constricted, large segments of the business were shut down and eventually an involuntary petition was filed. The case was later converted to Chapter 7 and the company was liquidated. On appeal, the trustee argued that in valuing property, plant and equipment ("PP & E") the district court erred in using a going concern approach. The court observed that "[w]here bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis." *Id.* at 1067. According to the court of appeals, the district court's finding that the debtor was not a company whose failure was clearly imminent on the date of the conveyance was supported by the record which showed a balance sheet net worth of more than three times the liabilities, a positive cash flow and a break even year. The district court found a going concern value for PP & E of at least $5–6 million. That number was the lowest of five choices presented to it on the record.[25] Because the district court's selection of the lowest of the five choices for the PP & E still resulted in a

---

**25.** Values presented included: (1) a $17.7 million book value; (2) a two year old manufacturer's appraisal of $29 million; (3) the prior owner's $11 million of capital improvements; (4) the creditor's expert valuation of $13.7 million, and (5) the $5.65 million selling price received in

selling off the PP & E component parts in three sale transactions, one shortly before the petition and two after it. The creditor offered no evidence on the going concern value because he argued that the entire company could not be worth more than the price paid for the stock.

finding of solvency, the case is not very instructive on how to apply the going concern test.

As best as I can discern from its briefs, Travellers' position is that a going concern approach does not require consideration of what the assets could produce to pay creditors, but rather involves an "in place" value to the debtor on the assumption that the debtor will continue as a going concern for an indeterminate time and in some unexplained fashion and with no time constraints, pay off its creditors. I find no support for that concept in the cases relied upon by Travellers.

Travellers' argument on going concern valuation takes a confusing turn when it states in one of its post-trial briefs as follows:

> The going-concern assumption, as it applies to balance sheets, contemplates that assets will be converted to cash *through the normal operations of the company* and used to pay off liabilities *in the normal course of business*. Tr. 690, 762–63; Def. Ex. 3 at F–15. It does not contemplate a conversion of assets to cash by the process of a piecemeal liquidation. Rather, "assets must be valued, not as isolated articles separated from the whole, but as parts of the whole and as useful in that relationship." *In re Bellanca Aircraft Corp.*, 56 B.R. 339 at 396–97 (Bankr.D.Minn.1985). (Traveller's emphasis.)

Def.Br. 7–8.

Travellers' citation to the record is to the testimony by TWA's accounting expert's comments on, and to TWA's December 31, 1991 financial statements reflecting, going concern accounting presentations. Travellers seriously confuses the analysis under the Code definition of "fair valuation" with accounting presentations called for by GAAP. Accounting conventions are not the controlling principles for the legal determination of whether a debtor's debts exceed the fair

value of its assets for purposes of insolvency. *See In re F & S Central Manufacturing Corp.*, 53 B.R. 842, 849 (Bankr.E.D.N.Y.1985) ("Asset values carried on a balance sheet, even if derived in accordance with 'generally accepted accounting principals,' do not necessarily reflect fair value: 'Generally accepted accounting principals' are not synonymous with any specific [valuation] policy.") (quoting *Pittsburgh Coke & Chemical Co. v. Bollo*, 560 F.2d 1089, 1092 (2d Cir.1977)); *In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 299 (Bankr.D.Mass.1983) ("[A]n asset entry on a balance sheet may not necessarily be an asset for the purpose of determining insolvency even though it may be an appropriate entry in accounting terms."). In his report, Travellers' own accounting expert stated unequivocally that "GAAP does not permit the reflection of assets or liabilities at fair values." DX 72, p. 8.

If the accounting presentation dictated by GAAP were controlling here the trial of this matter, as well as this opinion, would have been brief. TWA's October 31, 1991 balance sheet shows debts exceeding assets by $557 million.[26]

The fact that TWA's financial statements during 1991 continued to be presented on a GAAP basis with a going concern assumption does little to support an argument regarding TWA's then financial viability. TWA's auditor's opinion letter for the December 31, 1991 fiscal year end states that in light of the numerous financial problems (including debt defaults and recurring losses) there existed "substantial doubt about the entity's ability to continue as a going concern." PX1, p. F–3. The quoted statement from the opinion letter represents the strongest statement of doubt available to an auditor respecting a company's ability to continue its business operations. Indeed, the auditors made clear that absent the proposed debt restructuring

---

**26.** As Travellers has demonstrated here, the "going concern" valuation concept can be easily confused with the "going concern" accounting presentation of GAAP. Indeed, in *Edward R. Bacan Company v. William B. Grover*, 420 F.2d 678 (9th Cir.1970) the court appears to have done just that. In reliance upon *Collier's* statement that "overwhelming authority" requires the

valuation of assets on a going concern basis, the court found the debtor to be solvent because the balance sheet showed a positive equity and "[t]he accountant testified that the books and the balance sheets accurately reflected the financial condition of the debtor as a going concern." *Id.* at 679.

the going concern assumption for TWA was in serious doubt. The facts and circumstances which resulted in the auditor's qualified opinion for December 31, 1991 were essentially the same as existed on November 4, 1991. Similar "substantial doubt" caveats are found in auditors' GAAP presentations with "going concern" assumptions in opinions issued in May 1991 with respect to the financial statements of Midway Airlines, Inc. and Pan Am Airlines, Inc. PX 74, p. F–2; PX 77, p. F–2–3. Both of those entities ceased operations and liquidated later in 1991 with only fractional recoveries by creditors.

I find nothing in the Code or the case law, other than isolated statement without analysis, to support Travellers' position that in making a "fair valuation" determination, the so called "going concern" approach does not involve a consideration of realizing value from the assets which value (cash) can be paid to creditors within a reasonable time period. Absent that consideration, the valuation becomes a theoretical exercise.[27] As the court observed in *In re Coated Sales, Inc.,* 144 B.R. 663, 668 (Bankr.S.D.N.Y.1992), "fair market valuation entails a hypothetical sale, not a hypothetical company." Travellers' po-

sition does not say how creditors can benefit from asset values premised on optimal operations of a debtor which in fact is in financial distress. Like the preference creditor, other creditors can only benefit by being paid. Consequently, I conclude that in this case a § 547(b)(3) insolvency analysis requires a determination of the amount of funds which could be generated by converting non-cash assets into cash.[28]

I believe my conclusion here is supported by the analysis conducted by Travellers' accounting expert and set forth in his report. That expert started with the October 31, 1991 balance sheet, added the values assigned by Global, deducted book value duplications, and made additional adjustments to certain book values (discussed *infra*) to arrive at asset values for various categories of assets. He then deducted the book value tax bases of the assets and subjected the gain on sale of the assets as so valued to an assumed combined federal and state tax rate of 37.5% to reach an assumed net gain from the sale of assets. I find this exercise to be an acknowledgment of the need to convert non-cash assets to cash to see if the non-prefer-

**27.** At numerous places in its brief, Travellers equates "fair value" with "fair market value." But the market concept is inconsistent with Travellers' approach to valuation. A market connotes a place of commercial activity in which property is bought and sold, or a bringing together of buyers and sellers to exchange consideration. Thus, a market approach to valuation is consistent with the view of the need to address the conversion of non-cash assets into cash.

**28.** A determination of the amount of funds which could be generated by converting non-cash assets into cash in doing the insolvency analysis may not be required in all § 547(b) cases. For example, the preference creditor may be able to demonstrate that other creditors could be paid in full, by demonstrating an ability of the debtor to refinance all its debt, or obtain an equity infusion or a combination of both, to "take out" all the old debt. As demonstrated below, the record here clearly shows that a 100% "take out" of the old debt was not a realistic possibility in November, 1991. In *Covey, supra,* the court formulated the insolvency test as follows: "To decide whether a firm is insolvent within the meaning of § 548(a)(2)(B)(i), a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities? If the

price is positive, the firm is solvent, if negative, insolvent." 960 F.2d at 660. Subsequent to trial, I invited the parties to consider whether the *Covey* case suggested a different approach for testing solvency and whether the record should be reopened to receive testimony on whether TWA could attract a positive price buyer on November 4, 1991. The parties saw no useful purpose to be served in such an exercise. Travellers felt that little concerning the solvency of a debtor could be inferred from such testimony. Such conclusory testimony would surely prompt a detailed analysis of the underlying asset values not unlike what the parties had already placed on the record. The *Covey* court's comment may be viewed as a different way to state the exercise already undertaken by the parties in this matter. One case suggests that a going concern value can be determined by capitalizing net profit. *In re Vadnais Lumber Supply, Inc.,* 100 B.R. 127, 131–33 (Bankr.D.Mass.1989). I would agree that this could be an approach in demonstrating an ability to take out old debt with new money. However, a history of, and near term prospects for, net profits may not alone be sufficient to make the determination. For example, a currently profitable operating entity may have contingent or unliquidated environmental or tort liabilities which no knowing lender/investor would assume.

ence creditors could be made whole, i.e., fair as well as Travellers.[29]

While Travellers argues vigorously in its opening post-trial brief that "the determination of fair value does not require a determination of the cash that would be realized if assets were actually sold," Def.Br. 5, in its reply brief it claims that "Global's opinion of the assets' fair market values represents the amounts TWA's assets would fetch if a sale were negotiated within a reasonable time." Def. Reply Br. 8. At this point I must confess some confusion as to Travellers' position. Perhaps Travellers' first argument was prompted by the fact that Global's "reasonable time" is an obscure concept. According to Global, reasonable time here means that some assets "could be sold in two days, some in two years and some it might take five years." Tr. 356–60. Under the circumstances, I find TWA's 12–18 month conversion period to be a reasonable approach.[30]

To the extent that Global's asset values reflect Travellers' valuation theory, I would be inclined to reject them. However, since Travellers' reply brief represents that those asset values are sale values, I will undertake a category by category examination of the conflicting valuations for operating assets as put forth by Avmark and Global.

*TWA's Condition on November 4, 1991.*

Before detailing specific reasons for my value conclusions on various categories of assets, I start by setting this matter in the appropriate context. As demonstrated by the following, TWA was a financially distressed entity in an industry in crisis as of November 4, 1991.

1. The year 1991 was a very poor one for the airline industry and by November, its condition was deteriorating seriously. In 1991 the industry had an operating loss, before debt payments, of approximately $3.8 billion. The outlook was that 1992 would be another poor year. A number of airlines were already in bankruptcy, including Pan Am, Eastern, Continental, Midway and American West and were trying to dispose of assets. There was a threat that bankrupt and financially weakened airlines would be selling more assets in the months and years following November 1991. The liquidation of airlines saturated the market for airline assets. Moreover, the industry had committed to purchase approximately $140 billion in new assets. In short, the airline industry in November 1991 was "depressed" and that depression was expected to persist for the foreseeable future.

2. By January 1991 TWA's domestic flight service was reduced by approximately 20% from that in January 1990 and international flight service was reduced by approximately 50%.

3. Because of its deep liquidity crisis, TWA was forced to stop making payments which were otherwise due under many of its equipment leases. It was also forced to withhold payments due and owing under its debt

---

**29.** Travellers' accounting expert's report states the purpose of, and assumptions involved in, his valuation task in terms which I find to be consistent with the approach which I adopt. His report states:

> As an overall assumption, the fair value of assets and liabilities has been predicated upon the fact that TWA was a going concern. Further, we have relied on the following definition of fair value for the purposes of including the assets at fair value from the leading bankruptcy commentator:
>
> "... Couching the mandates of fair valuation in positive terms it can be said that they direct the estimate of *what can be realized out of the assets within a reasonable time either through the collection or sale at the regular market value,* conceiving the latter as the amount which could be obtained for the property in question within such period by a 'capable and diligent business man' from an

interested buyer 'who is willing to purchase under the ordinary selling conditions.' "
2 *Collier on Bankruptcy* at 101–104–05 (15th ed. 1992) (footnotes omitted). *We have also assumed the orderly repayment of liabilities.* It is further assumed that in connection with TWA's ongoing restructuring, which was taking place as of November 4, 1991, that certain assets would be disposed of and other operating modifications would be accomplished in the normal course of business and in an orderly fashion.
DX 72, p. 8. (emphasis added).

**30.** A valuation based on a conversion to cash and payment to creditors over an extended period of time such as two to five years ignores the time value of money. A 100% payment to other creditors which occurs years after a preference transfer is not the same as the 100% payment to the preference creditor.

instruments. As of November 1991, TWA had withheld payments to its creditors of approximately $162.2 million, including approximately $158.9 million in principal and interest on its debt securities. As a result of TWA's failure to meet its payment obligations, many of its indenture trustees, noteholders and lessors declared defaults and accelerations of indebtedness. These actions in turn triggered cross-defaults and cross-accelerations in substantially all of TWA's debt obligations. Numerous creditors demanded remedies including termination of their arrangements with TWA, seizure of collateral, and return of leased equipment. A number of legal proceedings were brought by TWA's creditors against the company to enforce such remedies. For example, certain of TWA's creditors were enforcing remedies for seizure of approximately 30 of TWA's aircraft and related engines.

4. TWA was in severe financial condition in 1991 and its precipitous financial decline was especially acute by the third and fourth quarters of 1991. Its net working capital deficit, (i.e., the excess of current liabilities over current assets) exceeded $1.4 billion.[31] For the first nine months of 1991, TWA had suffered an operating loss of some $258 million, losing approximately $1 million per day. As of September 30, 1991, approximately $340 million aggregate principal amount of TWA's indebtedness had been accelerated. The financial condition of TWA worsened between September 30, 1991 and November 4, 1991. In its Form 10–Q filed with the SEC in November 1991, TWA stated that absent a debt restructuring, it would exhaust its cash resources by mid–1992 if it brought its debt and lease obligations current.

5. Starting in February 1991 TWA commenced issuing a series of press releases which foretold of its January 1992 Chapter 11 filing. On February 1, 1991 it announced it was withholding payment of $75.5 million in principal and interest due on several issues of secured publicly traded debt and that it would immediately be contacting creditors to seek their cooperation in restructuring the debt. On April 21, 1991 it announced that summer bookings had improved substantially, that its cash position had stabilized, and that it now believed that it could survive the current difficult climate in the industry without the need for rehabilitation under Chapter 11. However, it announced on July 30, 1991, that following intensive negotiation it had reached preliminary agreement with groups of public noteholders to eliminate approximately $1 billion of debt. The restructuring would be accomplished through a prepackaged reorganization to be filed in early 1992. On October 14, 1991 TWA announced that negotiations for a financial restructuring were virtually complete. On November 8, 1991, TWA referred to "our 1992 restructuring." On January 31, 1992 TWA announced the filing of the petition for its "pre-planned Chapter 11 reorganization."

6. In November 1991, TWA's publicly traded debt was trading at steep discounts as follows:

| Debt | Trading Price (as a % of face value) |
|---|---|
| 14.25% equipment trusts due 1991–1996 | 68 |
| 15% Senior (secured) due 1994 | 49 |
| 17¼ Senior (unsecured) due 1993 | 21 |
| 12% (unsecured) due 2001 | 9 |
| 12% (unsecured) due 2008 | 8 |

7. With respect to TWA's December 31, 1991 financial statement its auditors opined that recurring losses, the pending Chapter 11 case, the need to achieve satisfactory levels of future operating results and cash flow, and the need to obtain additional capital raised substantial doubt about the entity's ability to continue as a going concern.

---

**31.** The large deficit was principally attributable to the reclassification of long term debt to current debt as a result of accelerations triggered by defaults. Nevertheless, if that debt were removed from the current debt calculation, TWA still had a working capital deficit of $110 million.

On the other hand, Travellers cites the following in support of its contention that TWA was a vibrant entity in November 1991.

1. In July 1991 TWA made an offer to purchase Pan American Airways.

2. In September 1991 TWA announced that it was seeking new authority to operate between New York and London.

3. In October 1991 TWA added Western Airlines, Inc. as a new commuter affiliate and announced a new Business Saver Program involving specially discounted coupons to purchase flights up through April 30, 1992.

4. On November 8, 1991 TWA filed its SEC third quarter report, in which it stated that it was continuing discussions with all creditor groups to finalize a restructuring plan, and stated that in the interim "TWA intends to conduct business as usual and continue normal operations including . . . flight operations, honoring tickets and Frequent Flight Bonus program credits. TWA also intends to pay all of its trade creditors and to honor its lease and debt obligations that have already been restructured". DX 5 at 38–39. TWA's chairman stated that restructuring of debt and the renegotiation of leases "should position TWA as a formidable competitor in 1992 and beyond". DX 22.

5. In November 1991 TWA announced new, and lower, international business fares, that would be valid for travel completed by March 31, 1992, announced the initiation of a new business flyer award club, and heralded an agreement to purchase all of the assets of Pan Am Express, a commuter airline with feeder routes into TWA's New York–JFK hub. TWA's chairman referred to the acquisition as an "important step in the expansion of TWA's domestic operations and . . . a significant cog in our new JFK domestic hub".

6. In December 1991 the purchase of Pan Am Express was consummated and TWA immediately introduced new service to Florida and the Bahamas. It also announced new, lower fares to Europe (which were valid for travel completed before April 7, 1992), the completion of negotiations to lease three additional Boeing B–767s, and continuing negotiations to acquire or lease more aircraft.

7. In January 1992 TWA announced new business fares for tickets issued before May 20, 1992.

8. In announcing the January 31, 1992 filing of its Chapter 11 petition, TWA assured creditors and the flying public that the conduct of TWA's normal business affairs would in no way be affected by the filing and that TWA had on hand and available a total of approximately $500 million, consisting of cash on hand, and an additional $100 million to be received within approximately 30 days from previously announced asset sales, and up to an additional $200 million from debtor-in-possession financing which was to be arranged.

I attach very little weight to Travellers' list of "positives". For the most part, each of them falls into one of two categories—public relations puff or "rearranging the deck chairs on the Titanic."

Travellers dismisses the list of "negatives" up through November 4, 1991 as merely evidencing a liquidity problem, not insolvency. Travellers' position ignores reality. As early as July 1991, TWA announced what was probably already widely known in the marketplace: it was headed for the bankruptcy court because it had a debt load which exceeded the ability of its operations to handle. To have its debt load reflect its operations, it needed to eliminate $1 billion of debt. This was not proposed as a deferral of debt to solve a liquidity problem. It was to be a reduction. By November 1991 the situation had only worsened.[32] I find that as of No-

---

32. As noted above in the discussion of Travellers' argument that it had a security interest in the Cash Deposit, in late October 1991 Travellers was hustling to secure, or absent that, to execute on, its $12,336,127 judgment. It was well aware that its ability to collect on its judgment was in jeopardy. This is not a case of a preference creditor receiving a past due payment unknowing of the debtor's financial crisis. Travellers'

collection efforts were prompted by its knowledge of TWA's precarious financial condition. While under the Code, unlike the Act, there need be no finding that the preference creditor had reason to believe the debtor to be insolvent, the creditor's conduct in this case certainly can be considered as reflecting on the question of whether in fact the debtor was insolvent.

vember 4, 1991, absent a major financial restructuring, TWA was going the way of Eastern and Pan Am. The imminent filing of a Chapter 11 petition was inescapable. The only question remaining was whether TWA would come out of the Chapter 11 case as a reorganized entity.

Of course, TWA did come out of Chapter 11 as a reorganized entity—but the reorganization was neither quick nor painless for the creditors. Although TWA's press releases may have implied that the pre-filing debt restructuring terms were a "done deal," that was hardly the case. It took 20 months for TWA to obtain confirmation of its Plan and its terms incorporated only some of the pre-filing debt restructuring terms. Under the plan, the unsecured creditors, the class in which Travellers would have been but for the transfer, received less than $.20 on the dollar. TWA's equity holder was eliminated.

*Operating Assets Valuation*

Avmark's and Global's value opinions on various categories of operating assets, as compared to the October 31, 1991 balance sheet, are as follows:

| | 10/31/91 Balance Sheet (000) | Avmark's Values (000) | Global's Values (000) | Difference (Global Minus Avmark) (000) |
|---|---|---|---|---|
| Routes | $ 0 | $ 490,160 | $ 743,000 | $ 252,840 |
| Gates and Slots | 0 | 460,400 | 904,000 | 443,600 |
| Maintenance Facilities | 138,490 | 45,091 | 407,000 | 361,909 |
| Aircraft | 631,208 | 430,592 | 640,400 * | 209,808 |
| Spare Engines | | 96,110 | 122,000 | 25,890 |
| Spare Parts | 204,051 | 68,992 | 437,000 | 368,008 |
| Invest. in Affiliates | 116,951 | 166,770 *** | 344,732 | 177,962 |
| Ground Equipment | 97,388 | 29,697 | 91,000 | 61,303 |
| Leased Flight Equipment | 473,141 | 0 | 473,141** | 473,141 |
| Totals | $1,661,229 | $1,787,812 | $4,162,273 | $2,374,461 |

* This figure excludes Travellers' valuation of $965 million for certain aircraft which TWA had on order. Since Travellers calculated an offsetting liability of the same amount, the net asset value of zero is not considered here.

** Global did not value this asset. Travellers argues for the balance sheet number.

*** Avmark did not value this asset. TWA's value is based on other factors as discussed below.

---

I now turn to a comparative analysis of Avmark's and Global's valuations to make specific findings with respect to the value of each category of operating assets.

*Routes:*

Global valued TWA's international route authorities at $743 million, versus Avmark's $490.2 million. The many factors bearing upon the value of the route authorities makes an assessment of this asset difficult. Both appraisals are based on a number of very subjective determinations. However, I find a number of Global's determinations questionable. In its market method of valuation, Glob-

al used a mid-range multiplier based on "comparable" transactions. The high end of the range was weighted with two TWA–American Airlines transactions of questionable comparability. One was a December 1989 sale by TWA to American of its Chicago to London routes. Since Chicago is American's hub operation—and the routes therefore more valuable to American—this "comparable" distorts the valuation. As to the second TWA–American transaction, Global acknowledged that American probably overpaid for those routes. Global also relied upon "comparable" transactions that occurred in 1989 and 1990 and upon TWA's revenues from 1989 and 1990 in arriving at market values. The financial condition of the airline industry was significantly worse in 1991 than it had been in the prior two years. In valuing TWA's routes to Europe out of JFK Airport, Global acknowledged that TWA's domestic feed to JFK Airport subsidized the international routes. But the cost of that subsidy was not reflected in Global's valuation of those routes either in the market or income methods used.

Because I believe the above described deficiencies in Global's valuation compound the problem of subjective determinations in the route valuations, and since I do not find similar deficiencies in Avmark's valuation, I adopt Avmark's value of $490.2 million for the route authorities.

*Gates and Slots:*

Global valued gates and slots at $904 million, almost twice Avmark's value of $460.4 million. Within this category, the largest gap is between Global's valuation of takeoff and landing slots at $237 million and Avmark's valuation of $88.4 million. I find significant deficiencies in Global's valuation to explain this gap. Global's expert had no prior experience in valuing slots.[33] To a significant degree, Global relied upon a February 1990 U.S. Department of Transportation study and a February 1989 study by an industry analyst. Both reports are based on a limited number of transactions and on market data seriously outdated relative to the

industry's condition in November 1991. Furthermore, the U.S. Department of Transportation report expressly states that its analysis may overvalue slots where the carrier/buyer does not have gate and terminal capacity at the particular airport. Such an acknowledged shortcoming makes this source for Global's views of questionable value.

With respect to a number of slot transactions relied upon by Global which took place in 1991 the parties are sharply divided on how to interpret the transactions as they reflect the prices paid for slots. This difference results from the fact that either the slot sales were part of a package sale or the particular transaction was related to other dealings between the parties to the transaction. This conflict in interpreting a particular transaction underscores the difficult task of valuing assets whose value is tied into the existence of and value of other assets used in conjunction with gates and slots. Because I cannot conclude that Global's "comparable" transaction provide a proper guide here and because of my low level of comfort with Global's limited valuation experience in valuing slots and its reliance on outdated sources, I conclude that its valuation of slots is not reliable. I take more comfort in Avmark's methodology and therefore I adopt Avmark's slots value of $88.4 million.

The gap between Avmark's valuation of gates at $372.4 million and Global's valuation at $667 million is principally found in the approximately $200 million spread in their difference in the valuation of TWA's St. Louis and JFK facilities. I find Global's valuation of these two facilities fails to give adequate consideration to a number of significant factors. St. Louis is the hub of TWA operations. To realize maximum value, its gates would have to be sold as a hub operation, creating a very limited market for the property. Travellers argues that Global identified "four airlines that would be interested in establishing" a St. Louis hub. Def.Reply Br. 13. Travellers takes liberties with the language of the Global report. In its report, Global noted that "[w]hile most

---

**33.** He likewise had no prior experience in valuing gates, and had limited prior experience in valuing routes.

major carriers have established their hubs for the foreseeable future, a few [U.S. Air, American West, Continental and Northwest] *might* find St. Louis an attractive possibility." DX 67 at I–41. [emphasis added.] Not only does the language in Global's report not support Travellers' assertion, I find Global's observation about a potential buyer vague and speculative. The difficulty of finding a buyer for the St. Louis hub operation gates is not adequately addressed in Global's valuation of $203 million and I therefore adopt Avmark's valuation of $139.1 million.

As to JFK Airport, Global valued 32 gates at $217 million (i.e., $6.78 million per gate) based on (a) the estimated cost of constructing new gate facilities, (b) its assessment that TWA's high number of gates could command a premium price, and (c) a comparable Pan Am transaction at JFK Airport. I find Global's estimated construction cost to be based on a confusing reference in an industry publication. Furthermore, it is an estimate for new construction rather than for the existing TWA facilities at JFK. Additionally, Global does not explain what the premium is for the high number of TWA gates. Actually, I believe that the high number could have a negative impact on value because of the difficulty of the market absorbing a large number of gates in a limited period of time. Finally, Global's valuation of the TWA gates appears to be essentially based on a Pan Am sale of 32 gates for $217 million—$6.78 million per gate. Travellers argues that this transaction may even represent a conservative value figure because the Pan Am gates were purchased by Pan Am's pension plan and the pension plan trustee had a fiduciary duty to not overpay for such assets. I view the transaction differently. I view it as a non-arms length transaction. And, of course, we know that subsequent to the transaction Pan Am went out of business. More importantly, the transaction took place in 1989, when the level of distress in the industry was not nearly what it was in November 1991. For these reasons, I adopt Avmark's JFK gates valuation of $82 million. Accepting Global's valuation for gates other than St. Louis and JFK, I find the value for all the gates and slots to be $566 million.

*Maintenance Facilities:*

Global values TWA's maintenance facilities at almost 10 times the Avmark valuation—$407 million versus $45.1 million. I find Global's valuation of $407 million to be seriously deficient. The valuation involved five facilities, with the major facilities at Kansas City and JFK representing 84% of the value. The Kansas City facility alone represents 66% of the value. Global's expert did not visit any of the facilities. His valuation was based on two methods—replacement cost and income stream. The market approach was not used because there had been no recent transactions involving major maintenance facilities.

For the replacement cost method, Global looked at current construction costs for similar facilities, calculated the total cost based on the square footage involved and then reduced the number by 50% for Kansas City and 75% for JFK to account for age and physical condition. Both facilities are approximately 35 years old and do not meet modern design requirements for such facilities. Reliance on the replacement cost method for valuing aged limited use improved real estate is, as a general proposition, risky. Given the extremely limited market for such facilities in the airline industry and the fact that Global did not even inspect them—I note that Avmark's expert testified that he was very familiar with these facilities and had done valuations of them in the past—I find Global's replacement cost method to be of dubious application here.

I take no greater comfort in Global's income method. For this method, Global relied upon information from the Port Authority of New York and New Jersey regarding revenue earned from contract maintenance performed at Pan Am's JFK facility. The Pan Am facility has been for sale for several years, and, according to Avmark, TWA's JFK facility is in worse condition than that of Pan Am. More importantly, in its own report Global raises serious doubt as to the reliability of the Pan Am JFK facility information. According to Global, "[t]he data used in the income approach is based *solely* on Pan Am's facility which *may not* necessarily be representative of the industry *or even*

*that accurate."* DX 67 at III–7. (emphasis added.) Given such a sweeping caveat, I decline to accept Global's income method opinion as probative of the value of TWA's maintenance facilities.[34]

Because of what I find to be serious deficiencies in Global's valuation of TWA's maintenance facilities, I adopt what I believe to be the more realistic Avmark value of $45.1 million.

*Aircraft and Spare Engines:*

TWA claims a value of $526.7 million, versus Travellers' value of $762.4 million, for TWA's aircraft and spare engines. Both experts agreed as to the dismal state of the market and as to TWA's aging fleet. They agreed that at November 1991 (a) there was a huge oversupply of used aircraft, (b) prices were expected to fall, (c) TWA's fleet was aging and inefficient and its average age was extremely high, (d) TWA's stage II aircraft have a limited useful life, and (e) the industry had made substantial commitments to purchase newer, more efficient wide-bodied planes. Global's value exceeded Avmark's by 45%. Based on their reports and the testimony of the two appraisal experts, I find it difficult to arrive at a finding of value for this category of assets. However, based on other evidence, I am lead to conclude that Global's value is inflated.

Global valued 10 of the aircraft and 65 related engine spares at $128 million. These 10 aircraft and 65 related engine spares served as collateral securing TWA's Equipment Trust Certificates due in 1991 and 1996. The face amount of the Equipment Trust Certificates outstanding in November 1991 was $53.6 million and they were being publicly traded at $.68 on the dollar. Thus, the market valued these securities at $36.5 mil-

lion at a time when Global insists the underlying collateral had a value of $128 million. This difference cannot be accounted for by the changing interest rates.[35] Given the short maturity of the securities, it is obvious that the market did not believe that the underlying collateral had a liquidation value of $53.6 million or more. To conclude, nevertheless, as Global did, that the collateral had a fair value of $128 million seems quite implausible to me. If the fair market value of the collateral is 234% of the book amount of the debt secured by the collateral, how is it possible to purchase the debt at 68% of its book amount? If the public debt holders viewed the asset values as Global did, then the debt would have been trading much closer to its face value. Even if one were to assume a 50% loss of value in a foreclosure sale, this would be so. Conversely, if the debt market was right, then Global is wrong. In my view, this limited empirical evidence far outweighs the expert's subjectively influenced determination and it leads me to conclude that Global's aircraft and spares value is inflated. I therefore find that, at most, the value of the aircraft and engine spares should not exceed the Avmark value of $526.7 million.

Travellers argues that the steeply discounted trading prices for TWA's debt did not reflect collateral value or TWA's insolvency. In support of this position, Travellers offers two arguments. First, Travellers claims that "[t]he market was not likely to attribute a market price based on a going concern scenario, but instead necessarily took a more conservative approach and valued the assets at a reasonable estimate of their short-term liquidation value." Doc.

---

34. As noted above, Global's valuation of the maintenance facilities produced a number almost 10 times that of Avmark's valuation. Although the differences were not as dramatic, these experts were also poles apart in their valuations of routes, gates and slots and spare parts. Expert testimony is offered to assist the court in making finding of fact on subjects as to which the court is obviously not an expert. When experts offer widely disparate valuations, the question arises as to whether the integrity of the process is being compromised. When I find what I consider to be gross deficiencies in aspects of the valuation

methodology, my level of comfort with the testimony in general of that expert is diminished.

35. The parties agree that the steep discount trading prices for TWA's publicly held debt was not attributable to changed market interest rates. Market interest rates were lower in late 1991 than when the debt instruments were originally issued in 1986–88. Thus, solely on the basis of the market interest rates the obligations should have been trading at premiums in late 1991.

# 115 at 5. I view it differently. I believe the market viewed TWA's going concern prospects, absent a debt restructuring, as dim. The conclusion is inescapable that these obligations were viewed as high risk and therefore the value of the underlying collateral was being assessed by the market. While a foreclosure scenario might explain some portion of the discount, I believe it does not explain most of it. The difference is too dramatic. Second, Travellers argues that the debt instruments arose out of the leveraged buy out which took TWA private in the mid 1980s, and because those debt instruments were of "junk" quality, in reality they should be viewed not as debt but as equity. Indeed, by this approach, Travellers would reclassify $672 million of unsecured subordinated debt, call it equity and thereby have available more assets to satisfy "real" debt. Travellers approach turns the insolvency analysis into an Alice in Wonderland semantics exercise. It has no basis whatsoever in statutory or case law authority and I reject it.

### Spare Parts Inventory:

As to this category of assets, the parties are far apart, with TWA valuing the spare parts at $69 million and Travellers at $437 million. Travellers' value is more than six times that of Avmark. Probably no category of tangible assets on the balance sheet of a distressed company is more suspect of value than inventory. Global's valuation of $437 million is a replacement asset valuation and Global's testimony as to what could be realized in terms of sale at any time was vague and confusing. Much of the inventory consists of used parts, not new ones. Because of the very thin market for such a large quantity of inventory and bearing in mind that the spare parts are, for the most part, for outdated aircraft of limited life, I believe that Global's replacement cost valuation is unrealistic.

Like the situation discussed above with respect to aircraft and engine spares, I find the opinion of the market place to be persuasive on the issue of value for spare parts. TWA's 15% Senior Secured Notes due 1994 were secured by TWA's spare parts and landing slots. Global valued the spare parts at $437 million and the slots at $237 million, for a total of $674 million. The face value of the 15% Senior Secured Notes was $262 mil-

lion, and in November 1991 they were trading at less than $.50 on the dollar. Thus, the market was valuing the collateral at less than $131 million, or approximately 30% of Global's valuation of the spare parts collateral alone. As noted above, this situation is not attributable to the difference between the 15% coupon rate of interest and the then current market rate of interest. I conclude that it is explained by the market place's assessment of collateral value substantially under that opined by Global.

Avmark's value of $69 million represents a rationally explained alternative to Global's unrealistic and inadequately explained value of $437 million. I adopt the $69 million value for spare parts.

### Investments in Affiliates:

The parties are also quite far apart in their valuation of TWA's investments in affiliates, with TWA claiming a value of $166.8 million and Travellers claiming a value of more than twice that, or $344.7 million. These investments consist of four separate assets. As to two of them, namely, Travel Marketing Corporation and "Other Affiliates," the parties are in agreement as to an aggregate value of $82.7 million. The two assets on which the parties disagree are Worldspan, a computer reservation system in which TWA has a 25% partnership interest, and Getaway Vacations, a wholly-owned subsidiary operating a group tour service. TWA values Worldspan at $84 million and Travellers values it at $200 million. TWA values Getaway at $0 and Travellers values it at $62 million.

Global valued Worldspan by analyzing seven market transactions involving the transfer of interests in the four major domestic computer reservation systems. From these transactions Global concluded that the value of each market-share point was $42.6 million. Since Worldspan's market share was 21%, Global concluded that Worldspan value was $896 million ($42.6 million × 21). Global then "conservatively" reduced that number to $800 million. Since TWA owns 25% of

Worldspan, Global concluded that TWA's interest in Worldspan is worth $200 million.

Avmark did not value the Worldspan interest. TWA asserts that the Global valuation is based on speculative or hypothetical markets, a claim which Travellers disputes. TWA takes a different approach to valuing its Worldspan interest. The Worldspan partnership agreement contains a restriction on the transferability of TWA's partnership interest. In November 1991 TWA was in default under the partnership agreement in the amount of $27 million. This represented eleven monthly payments. If the default continued for twelve months, the other partners had a right to acquire TWA's interest based on a pricing formula which produced a figure of approximately $84 million. However, the full twelve months default was not complete in November 1991 and in December 1991 the total arrearage was paid by TWA. Under the circumstances, I cannot conclude that the partnership agreement buy-out price of $84 million represents a ceiling on the value. In the absence of any other valuation approach being offered by TWA, I will adopt Global's value of $200 million.

Travellers' valuation of Getaway was conducted by an individual experienced in tour operations. Based on an income stream analysis, Travellers' expert arrived at a value of $62 million. TWA did not offer an expert opinion on the value of Gateway. Relying on Gateway's 1991 balance sheet showing a negative shareholder equity of almost $4 million, TWA claims the value is zero. Travellers' expert discounted the balance sheet evidence on the grounds that (a) 1991 was an unusually bad year for tour companies because of the Persian Gulf War and (b) it is a cash flow business and the balance sheet numbers are not particularly relevant. While I find Travellers' expert's analysis to be premised on certain optimistic assumptions about profit margins and market share, since TWA of-

fered no evidence other than the Getaway balance sheet—which I find to be of little probative weight—I find the most probative evidence is that offered by Travellers and I therefore find Getaway to have a value of $62 million.

*Ground Equipment:*

Compared to a book value of $97.4 million, Avmark determined the fair market value of ground equipment to be $29.7 million. Avmark found much of the ground equipment to be old, in poor condition and probably having value only to TWA. Global concluded that the ground equipment had an in use value of $91 million. However, it had no opinion as to the value which could be achieved in a sale of those assets within a reasonable period of time [36] and, indeed, it did not disagree with Avmark's sale value. I agree with Avmark's market value approach and conclude that the ground equipment had a value of $29.7 million.

*Leased Flight Equipment:*

This item is carried on the October 30, 1991 balance sheet at $473.1 million. Avmark opined that given the market conditions (i.e., the market lease rates) as of November 4, 1991, TWA's leasehold interests had no value. Global did not value the leased flight equipment for Travellers. Travellers cites testimony by its accounting expert to suggest that the GAAP reporting of this item on TWA's balance sheet reflects fair value. For the same reasons discussed above regarding balance sheet "values," I am not persuaded. I find that the only probative evidence on the issue is Avmark's expert opinion and I therefore find that the leased aircraft had no value.

In summary, the above described analyses of Avmark's and Global's valuations leads me to conclude that the value of TWA's operating assets as of November 4, 1991, as compared to TWA's and Travellers' views, was as follows:

**36.** I cannot reconcile this Global testimony with Travellers' claim that "Global's opinion of the assets' fair market values represents the amounts TWA's assets would fetch if a sale were negotiated within a reasonable time." Def.Reply Br. 8. Indeed, when it came to opining on how much various categories of assets would fetch in a sale within a reasonable period of time, I found Global's testimony generally to be equivocal and in several instances inconsistent with prior deposition testimony.

| | TWA (000) | Travellers (000) | Court (000) |
|---|---|---|---|
| Routes | $ 490,160 | $ 743,000 | $ 490,160 |
| Gates and Slots | 460,400 | 904,000 | 566,000 |
| Maintenance Facilities | 45,091 | 407,000 | 45,091 |
| Aircraft and Spare Engines | 526,702 | 762,400 | 526,702 |
| Spare Parts Inventory | 68,992 | 437,000 | 68,992 |
| Investments in Affiliates | 166,770 | 344,732 | 344,732 |
| Ground Equipment | 29,697 | 91,000 | 29,697 |
| Leased Flight Equipment | 0 | 473,141 | 0 |
| Total | $1,787,812 | $4,162,273 | $2,071,374 |

*Non–Appraised Assets*

TWA's October 31, 1991 balance sheet contains several asset items which were not the subject of appraisal testimony but as to which the parties disagree on their fair value. These are (a) prepaids and other deferred charges and (b) prepayment of flight equipment. I resolve the parties' differences on these items as follows.

*Prepaids and other deferred charges:*

Travellers' accounting expert accepted the $72.2 million GAAP book figure as the fair value of prepaids and other deferred charges. That, of course, is consistent with Travellers' argument that fair valuation is a going concern value without a liquidation within any period of time. TWA's accounting expert assigned a zero value to these assets because they could not be recoverable or convertible into cash within a reasonable time period. Because I hold that a § 101(32) insolvency analysis in the context of this case requires a consideration of the conversion of non-cash assets into cash within a reasonable period of time, I find that the prepaids and other deferred charges have no value.

*Prepayment of flight equipment:*

This item is carried on the October 30, 1991 balance sheet at $27.9 million. Travellers' accountant reduced it to $9.4 million. TWA argues that it should be reduced to zero because it was in default under the purchase agreement and therefore could not recover the prepayment. By reason of this fact, I find the value of this prepayment to be zero.

*Other Assets:*

There is no dispute as to fact that the balance sheet reflects the fair value of cash and cash equivalents of $402.4 million. While the accounting experts took different approaches in valuing various categories of accounts receivable, their net results were not significantly different. For purposes here, I adopt Travellers' figure of $476.4 million. Likewise, as to other investments and receivables which Travellers valued at $175.7 million.

*Summary of Asset Values*

Based on my conclusions of operating asset values as recited above in comparing and analyzing Global's and Avmark's determinations, and combining those with the non-appraised assets and the balance sheet values as to which there is no dispute, I conclude that at November 4, 1991, the fair value of TWA's property was as follows:

|  | (000) |
|---|---|
| Investments in affiliates | 344,732 |
| Other investments and receivables | 175,702 |
| Cash and cash equivalents | $ 402,373 |
| Total | $ 3,125,811 |
| Accounts receivable | 476,362 |
| Routes | 490,160 |
| Gates and slots | 566,000 |
| Maintenance facilities | 45,091 |
| Aircraft and spare engines | 526,702 |
| Spare parts | 68,992 |
| Ground equipment | 29,697 |

## DEBTS

With respect to the amount of TWA's liabilities as of November 4, 1991, the major differences between them are in the following categories:

|  | 10/31/91 Balance Sheet (000) | TWA (000) | Travellers (000) | Difference (TWA minus Travellers) (000) |
|---|---|---|---|---|
| Debt Obligations | $1,590,823 | $1,776,752 | $ 662,898 | $1,113,854 |
| Aircraft Lease Obligations | 813,604 | 595,000 – 813,604 | 813,604 | (218,604) – 0 |
| Pension Plan Obligation | 112,958 | 219,419 – 576,000 | 219,419* | 0 – 356,581 |
| Med./Dental ben. oblig. | — | 400,000 | 400,000 | — |
| Contingent Liabilities | — | 634,814 | — | 634,814 |
| Totals | $2,517,385 | 3,625,985 – $4,201,170 | $2,095,921 | 1,530,064 – $2,105,249 |

\* As explained below, there is some confusion as to Travellers' position on this obligation.

### Debt Obligations

According to TWA's accounting expert, the debt obligations on November 4, 1991 consisted of the following three elements:

|  | Amount (000) |
|---|---|
| Current maturities | $1,384,034 |
| Accrued interest | 206,789 |
| Unamortized discount on 12% Deb. | 185,929 |
|  | $1,776,752 |

According to Travellers' accounting expert, the debt obligations amount to only $662.9 million due to TWA's ability to purchase public debt at trading prices substantially below the face amount of the debt. Before discussing Travellers' methodology for calculating public debt obligations, it is necessary to examine the parties' respective views on the determination of debt for purposes of a § 101(32) insolvency test.

"The term 'debt' contained in the definition of 'insolvent' must be construed in light of the meaning ascribed to it under Section 101(12)." 2 Collier on Bankruptcy ¶ 101.32[6] at 101–117 (15th ed. 1994). Section 101(12) defines "debt" as "liability on a claim." Clearly, as of October 31, 1992 debt holders had claims against TWA in the aggregate amount of $1,776,752,000, (including the $185.9 million of unamortized original issue discount) reflected in the face amount of the debt instruments. Nevertheless, because the publicly traded portions of TWA's debt were being traded at steep discounts,

Travellers argues that such debt should be calculated at market prices. Travellers claims that "[n]umerous courts have stated that the Bankruptcy Code balance sheet test for insolvency requires that liabilities be determined at their fair value," which in the case of publicly traded debt is the amount at which the debt is being traded, or the amount for which a creditor would be willing to sell the debt instrument. Def.Br. 19.

The "numerous" cases cited by Travellers do not support its position and its reliance on *Mellon Bank v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir.1991), *cert. denied*, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992) as "controlling" on its position is misplaced.[37]

Both *Covey v. Commercial Nat. Bank of Peoria, supra*, and *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir.1988) are inapposite as they involved analyses of the probability of loan guarantee contingent liabilities. Neither case suggests that publicly traded debt should be subjected to a "fair valuation" analysis, and *Covey* clearly states that the amount of debt is determined from the debtor's perspective, not that of the creditor:

> The Bankruptcy Code requires us to assess things from the debtor's perspective. Consider a simple case. Debtor issues its note for $10 million. It has assets of $5 million, secured debt of $2 million, and no other debt. From the creditor's perspective this note is worth somewhat less than $3 million. (Collection is costly and uncertain). Together, Debtor's creditors place a value of less than $5 million on its commitments. Nonetheless, Debtor is insolvent. Against assets of $5 million, there are claims of $12 million.

*Id.* 960 F.2d at 660.

Travellers' bankruptcy court citations are not helpful to its position. *Grove Peacock Plaza, supra*, contains no discussion of, but merely cites *Pembroke Development Corp.*,

*supra*, for the proposition that "[a] debtor is insolvent for preferential purposes when the fair value of its liabilities exceeds the fair value of its assets." 142 B.R. at 515. *Pembroke* also contains no discussion of the proposition, merely citing *F.H.L. Inc., supra*, as authority for the statement. 124 B.R. at 401. *F.H.L. Inc.*, in turn, contains no discussion of the proposition, merely citing *In re Camp Rockhill, Inc.*, 12 B.R. 829, 833 (Bankr. E.D.Pa.1981). 91 B.R. at 294. *In re Camp Rockhill, Inc.* not only does not discuss the proposition, it does not even use the term "fair value" in reference to liabilities. 12 B.R. at 832.

*Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir.1991), *cert. denied*, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992) also involved a consideration of the assessment of a debtor's portion of an obligation shared by other obligors. Travellers' reference to the court's statement that "[t]he debtor's assets and liabilities are tallied at fair valuation" is taken out of context and I do not find that *Mellon Bank* supports Travellers' position here.

The plain wording of § 101(32) does not support Travellers' position. The test is whether "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." Had Congress intended the meaning ascribed by Travellers, it could have easily drafted language to so state. The section could have read: "the sum of such entity's debts, at a fair valuation, is greater than all of such entity's property, at a fair valuation," or "at a fair valuation, the sum of such entity's debts is greater than all of such entity's property." As expressed in C. Fortgang and T. Mayer, *Valuation in Bankruptcy*, 32 UCLA LRev. 1061, 1094–95 (1985), the Bankruptcy Code

> provides for numerous valuations of assets, but aside from requiring the estimation of an unliquidated claim, the Code does not

---

**37.** Travellers' "numerous" cases are: *Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d at 660–61; *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988) (discussing method to determine fair value of contingent liabilities); *Grove Peacock Plaza, Ltd. v. Resolution Trust Corp. (In re Grove Peacock Plaza, Ltd.)*, 142 B.R. 506, 515 (Bankr.S.D.Fla.1992); *Pembroke Dev. Corp. v. Commonwealth Savings & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 401 (Bankr.S.D.Fla.1991); *Hargrave v. Boehmer (In re F.H.L., Inc.)*, 91 B.R. 288, 294 (Bankr.D.N.J. 1988).

provide for valuation of liabilities at all. The interest rate and maturity of a claim do not affect its initial allowed amount. Instead, all unmatured principal amounts are accelerated, and every claim is allowed in the full face amount of its liability. Thus, a debtor's 5% debenture due in 1995 is allowed at par though it may have been traded at a discount prior to the petition. . . .

The discussions in *Covey, Xonics* and *Mellon Bank* involving valuation of multi-obligor claims fall within the category of estimation of unliquidated claims. They have no application here to the TWA publicly traded debt obligations.

Travellers' argument that both assets and debts should be "fairly valued" produces an anomalous result. If holders of claims are fully informed of the debtor's affairs and the asset values are less than the face amount of the claims, they would never value their claims at more than the value of the assets. Likewise, the fully informed debtor would never be willing to pay claimants more than claimants would be willing to take. Thus, the value of the claims would never exceed the value of the assets and insolvency could never occur.

Travellers' argument for fair valuation of debt is limited to TWA's publicly traded debts because Travellers had no basis for determining how the holders of non-publicly traded debt valued their holdings. But how does one distinguish in principle between valuing publicly traded debt and private debt? Surely the holders of the non-publicly traded debt also viewed the value of that debt at substantially below the face amount. Why should a distinction turn on the problem of how to gauge the holders' perception of value? Why not do a survey, or poll the holders of the non-publicly traded debt? Why not also survey, or poll the holders of trade debt? The short answer is that it does not make any difference what the creditors believe they can recover. They initially bargained with the debtor to recover the face amount of their claim and I believe that is what § 101(32) contemplates. When TWA finally had its plan of reorganization confirmed, the amount of "hit" which the debt holders took was not calculated on the basis of their perception of debt's value, i.e., likely recovery. It was calculated on the basis of the face amount of the debt without regard to whether it was publicly traded.

Travellers seeks to rationalize its valuation of TWA's publicly traded debt on the grounds that (a) in 1990 and early 1991 TWA purchased substantial amounts of some of its publicly traded debt at deep discounts, and (b) pre-petition TWA reached agreements with groups of public note holders to eliminate approximately $1 billion of debt. With respect to its market purchases, TWA responds that the subordination provisions of its trust indentures prohibited such market purchases and that in June 1991 senior note holders had obtained an injunction against TWA's market purchases of subordinated debt. Travellers, in turn, argues that TWA could effect market purchases of senior obligations before those of subordinated ones. I will not attempt to resolve the interplay among the various provisions of TWA debt instruments and what TWA could or could not accomplish in terms of additional market purchases of its debt. As a practical matter, I find it unrealistic to believe that, given its financial condition in November 1991 and its announced journey to the bankruptcy court, TWA could have embarked upon a program of spending hundreds of millions of dollars to retire public debt by market purchases. As of November 4, 1991, TWA's cash and cash equivalents were approximately $400 million and it had a large working capital deficit; to conserve its cash position it was withholding payments to creditors of approximately $162.2 million; it was losing money on operations at the rate of $1 million per day; substantially all of its debt obligations were in default; it had been engaged in negotiations for months with its creditors to do a "prepackaged" Chapter 11 reorganization; and it had effectively announced to the world that it could not continue to operate absent a substantial capital restructuring. Even assuming that TWA could (a) commit a major portion of its then cash position to debt purchases, (b) effect an orderly liquidation of selected assets to raise additional millions of cash for such purchases and (c) effect an orderly liquidation of other assets to meet its

continuing operating deficits in order to continue normal operations, I find it inconceivable that creditors other than public debt holders would stand by and watch such grand scale selective payments of debts. TWA had already announced that it was headed to the bankruptcy court. If TWA were not forced to file a voluntary petition, an involuntary petition surely would have intervened. Consequently, I reject Travellers' valuation of TWA's publicly traded debt as being based on assumptions which ignore the realities of TWA's financial condition.

Travellers' public debt valuation is also premised on the assertion that prior to its Chapter 11 petition TWA had reached an agreement with groups of public note holders to eliminate approximately $1 billion of debt. The effect of this "agreement" on the valuation process is argued repeatedly by Travellers throughout its briefs. I reject this argument. Contrary to Travellers' assertion, the debt restructuring was not the subject of a binding agreement prior to the filing of the petition on January 31, 1992. In its July 30, 1991 press release, TWA clearly indicated that the $1 billion savings resulting from the debt restructuring was to be accomplished through a "prepackaged" reorganization plan to be filed in early 1992. In July 1991 TWA reached a preliminary agreement with certain groups of debt holders to effect the reduction. The October and November 1991 press releases likewise referred to the restructuring as part of a proposed 1992 reorganization plan. On January 21, 1992, TWA entered into a term sheet with certain of its debt holders. That term sheet, signed by no one, is labeled "Draft of January 21, 1992." Only certain elements of the term sheet found their way into the Plan approved by the Court on August 11, 1993. Thus, there was no pre-petition debt reduction of $1 billion, nor was there a binding agreement for the creditors to accept that reduction. As of November 4, 1991, there was a proposed $1 billion reduction of debt as a part of a proposed pre-packaged plan to be implemented in a yet to be filed Chapter 11 case. Presumably, the market trading prices were responding to the "write-downs" which were to be effected by a plan to be proposed in a filing to be made. However, as of November 1991, there had not been a reduction of debt, or an agreement for a reduction of debt, which could support an argument that TWA's public debt was only a fraction of its face value.

Travellers' market price valuation theory is also premised on a basic assumption, namely, that such a purchase program by TWA would be nondisruptive to the market. That assumption ignores the market forces. An informed public market would react to purchases and raise the asking prices. This in turn would increase the purchase price, i.e., value, of the debt. Even if TWA were a financially stable company, which it clearly was not, at some point in the bidding process it would have to stop its purchases. One could speculate almost endlessly—based on numerous scenarios about available cash, operating conditions, sales of assets to raise cash, etc.—as to when market forces would cause the purchase program to stop. Such speculation only underscores why Travellers' basic assumption is not a workable proposition.

Based upon my view of the law as to the meaning of debt for purposes of § 101(32), I find TWA's debt instruments obligations to be $1,776,752,000 as of November 4, 1991.

*Aircraft Lease Obligations*

TWA's October 31, 1991 balance sheets shows aircraft lease obligations of $813.6 million. This liability reflects capitalized leases, not operating leases. The balance sheet does not list a liability figure for operating leases, although TWA's December 31, 1991 Form 10–K disclosed future minimum operating lease payments of $881.2 million.

In his report, TWA's accounting expert relied upon management's estimate of liquidated damages of $595 million for both operating and capitalized leases and suggested a range of liability between the $595 million estimate and the $813.6 million book figure for the capitalized leases.

Travellers' accounting expert did not include in his calculations any liability for operating lease obligations because he assumed that either (a) the Global values assigned to flight equipment leasehold interests are equivalent to the operating lease liability, or

(b) the Global values assigned to the remaining leasehold interests are net of lease obligations (i.e., the buyer assumes the lease obligation).[38] I find this to be a rather sweeping assumption without factual foundation. While Travellers' expert estimated a $430 million operating "leasehold obligations not ascribed additional value," he did not add to or subtract from, or otherwise recalculate, the capitalized lease obligation shown on the balance sheet at $813.6 million. DX 72.

Since I do not accept Travellers' analysis, based as it is on an unacceptable assumption, I accept the only probative evidence of the amount of these unliquidated liabilities, management's estimate of $595 million as the amount of the aircraft lease obligations for both capitalized and operating leases.

*Pension Plan Obligation*

TWA's accounting expert presented a range of $219.4 million to $576 million for TWA's pension plan liability. While Travellers' expert's testimony on this issue is confusing, it appears that Travellers agrees that the minimum pension liability is $219.4 million. To the extent that Travellers disagrees, given the confusion in Travellers' evidence on this point, I find TWA's evidence on the point to be persuasive and I therefore conclude that TWA's minimum pension liability at November 4, 1991 was $219.4 million.

The $576 million high end for TWA's pension plan liability is based on an assumed termination of the pension plan. The figure is derived from information furnished by TWA's actuarial consultant. Based on a proof of claim filed by PBGC, TWA argues that the pension plan obligations could be as high as $1.124 billion. Since the PBGC proof of claim was not tested in this adversary proceeding, I accord it no weight in deciding the issue before me.

Travellers argues that the $576 million figure should be disregarded as it is based on a termination of the pension plan resulting from TWA's cessation of business, which is inconsistent with a going concern valuation. Because of the position I take here regarding fair valuation, i.e., an orderly sale of assets to pay creditors' approach, I believe that the plan termination scenario is a correct one and the pension plan liability should reflect it.

Travellers also argues that the $576 million figure is based on an unreasonably low 8% discount rate. While TWA's accounting expert asserted that $576 million is a "conservative" estimate, Travellers notes that TWA's actuarial consultant estimated TWA's termination liabilities while assuming six different discount rates and that the $576 million estimate is based on the lowest rate (8%) used by the actuarial consultant. The range of discount rates used by the actuarial consultant was from 8% to 13%, which produced a range of liability of $576 million to $195 million. My reading of the actuarial report suggests that the 8% discount rate is neither conservative nor realistic. While the parties furnished no guidance on this point, I believe a more appropriate discount rate would be 10%. According to the actuarial report, this produces a pension plan liability of $401 million. I therefore find the pension plan obligation of TWA on November 4, 1991 to be $401 million.

*Medical/Dental Benefits Obligation*

While the parties do not disagree on the $400 million liability for medical and dental benefits, the matter is in dispute because Travellers asserts that recording this liability creates a $400 million asset which thereby offsets the liability. TWA argues that an asset is not created by the recording of the liability.

The dispute centers on the application of the Statement of Financial Accounting Standard No. 106 ("FAS 106"). TWA, like many other businesses, made commitments over the course of many years, through collective bargaining agreements or otherwise, to provide medical and dental payments for retired employees. TWA, like many other businesses, accounted for these obligations on a pay-as-you-go basis, recording only current liabilities for the ensuing year's obligation. Because of the accounting profession's view that these substantial liabilities were not properly reflected on companies' balance

---

**38.** This is another example of the fact that, contrary to its post-trial briefs argument, Travellers' evidence reflects consideration of converting assets to cash to pay creditors.

sheets, FAS 106 was adopted. It requires that the actuarially determined liability be calculated. This calculated obligation represents the earned portion of the present value of estimated future benefits which a company's employees are entitled to receive. TWA and Travellers agree that on November 4, 1991 that obligation amounted to approximately $400 million.

According to TWA, FAS 106 allows TWA to recognize the $400 million obligation in either of two ways. One method provides that the full amount of the obligation is recorded with a corresponding charge to earnings. The other method allows a company to record the obligation incrementally over the average remaining service lives of its employees, not to exceed 20 years. In implementing FAS on January 1, 1993, TWA elected the second method.[39]

Travellers' accounting expert was of the view that pursuant to FAS 106 and GAAP, the acknowledgment of the $400 million liability required a corresponding debit entry to the asset side of the balance sheet which he labeled "Unrecognized post-retirement benefit transition obligation." DX 72, p. 5. While I am not persuaded by Travellers argument, it is not necessary for me to decide this issue on the basis of interpreting FAS 106 or GAAP procedures. The insolvency determination before me is not dictated by methodologies of FAS 106 or GAAP. Indeed, as noted above, GAAP does not permit the reflection of assets at fair value.

The apparent purpose of FAS 106 is to cause companies to acknowledge a known and quantifiable liability. TWA did that and Travellers agrees with it. The question that remains is; what value is it to TWA to have that liability. It is clearly not a saleable "asset" and it has no market value. Given the orderly sale of assets scenario which I find applicable to this case, I conclude that having the liability has no value to TWA which can be considered an asset in the determination of TWA's insolvency.

**39.** Following its emergence from bankruptcy in November 1993, as a result of "fresh start" reporting requirements, TWA was required to ac-

*Contingent Liabilities*

TWA's accounting expert calculated certain contingent liabilities in the amount of $634.8 million. These consist of $138.8 million payable to two of TWA's unions; $214.8 million for severance payments pursuant to contractual obligations, including collective bargaining agreements and related contracts, $33.1 million of COBRA obligations; and approximately $248.2 million in wind down expenses. These liabilities would accrue as a result of TWA cessation of its operations.

▇▇▇▇ Contingent liabilities should be included in determining "the sum [of the debtors] debts" pursuant to § 101(32).

A "debt" is defined as liability on a claim. 11 U.S.C. § 101(11). A claim includes a right to payment, even if it is contingent, unmatured, or not reduced to judgment. 11 U.S.C. § 101(4)(A). Since claims may be disputed or contingent, disputed or contingent liabilities must be included in determining total indebtedness for purposes of determining insolvency.

*In re Sierra Steel, Inc.,* 96 B.R. 275, 279 (9th Cir. BAP 1989). The amount of the contingent liability to be taken into account as a "debt" is determined by "the probability that the contingency will occur and the liability will become real." *Id.* at 279 (citing *Xonics Photochemical,* 841 F.2d at 200).

Because TWA had publicly announced in July 1991 that it could not continue to operate absent a substantial compromise of its debt obligations, TWA takes the position that the absence of such a compromise would result in a cessation of operation and a termination of its business. The remotely contingent liabilities would then become fixed obligations. Travellers contends that to include such contingent liabilities is contrary to the going concern valuation required by § 101(32). Given my position on the need to apply an orderly sale of assets to pay creditors approach in this case, I disagree. If TWA were required to wind down its operations and convert non-cash assets to cash in a 12 to 18 month period, its operations would

crue the full $400 million liability, which resulted in a corresponding charge against earnings.

obviously terminate and the liabilities contingent on that event would then become fixed.

Travellers further argues that GAAP provides that neither accrual nor disclosure of such contingent liabilities is necessary if their occurrence is remote. Since TWA's financial statements filed with the SEC did not accrue or disclose these contingent liabilities, then, according to Travellers, TWA's position can be accepted only if one assumes that TWA filed a series of false SEC reports. The problem with this argument is that the SEC financials were prepared on a GAAP basis on the *assumption* that TWA would continue as a going concern. As noted above, TWA's accountants expressed substantial doubt as to whether the going concern assumption could be sustained. Indeed, they and management, made it clear that absent a major capital restructuring TWA could not continue as a going concern. Of course, the major capital restructuring was effected in August 1993 following the Chapter 11 filing in January 1992. Absent that, termination of business scenario was likely to occur. Therefore, I find that the SEC filings not in conflict with the testimony supporting the conclusion that the contingent liabilities should be counted.

Travellers notes that TWA stated in a number of pre-petition press releases leading up to the petition filing that TWA would continue to conduct business as usual and continue normal operations. I attach no significance to such press release statements. Public pronouncements of optimism by management when embarking on a Chapter 11 filing are a normal part of public relations. Chapter 11 debtors never say on the eve of filing that they may not be able to reorganize and therefore we may have to liquidate. Public perception of availability, convenience and safety are absolutely critical in the airline industry, and such a candid announcement by an airline would sound the death knell for the company.

I agree in principle that these contingent liabilities should be counted. While I note that the total of $634.8 million includes $248.2 million of wind down expenses, based on "preliminary estimates," since Travellers did not contest the calculation, I will accept that

figure on the basis of the only evidence before me on the point.

### Taxes

TWA estimated a tax liability of up to $370 million. Travellers estimated a tax liability of $949.7 million. Travellers' higher tax liability, of course, reflects the much higher asset values for which it argues. Since the asset values which I have found are higher than those argued for by TWA, I conclude that the tax liability would be at least $370 million.

### Other Liabilities

In addition to the major categories of liabilities and the tax liability discussed above, TWA's balance sheet reflected a number of obligations as to which the parties' differences were within a limited range. Because of the different labeling used by the parties in listing these, it is impossible to do a detailed comparative analysis. For purposes here, I will adopt Travellers' numbers for these other liabilities. They aggregate $947.4 million. As shown on Travellers' Exhibit 72, these include Accounts and intercompany payables—$270 million; Advance ticket sales—$272.3 million; Employee compensation and vacation—$177.6 million; Other current liabilities—$3.9 million; Accruals—other—$127.5 million and Long-term—other—$96.1 million.

### Summary of Debts

Based on the above described analysis, I conclude that on November 4, 1991, TWA's debts aggregated as follows:

|  | (000) |
| --- | --- |
| Debt Obligations | $1,776,752 |
| Aircraft lease obligations | 595,000 |
| Pension plan obligation | 401,000 |
| Medical/Dental benefit obligation | 400,000 |
| Contingent liabilities | 634,814 |
| Other obligations | 947,381 |
| Taxes | 370,000 |
|  | $5,124,947 |

With TWA's property having a value of $3,125,811,000, it is clear that TWA was insolvent on November 4, 1991.

## SUMMARY CONCLUSION
## ON INSOLVENCY

As I view this matter, the category by category determination of asset values and the assessment of liabilities as discussed in detail above produces a conclusion of insolvency which one would logically reach based on TWA's critical financial situation in November 1991. Unlike many pre-petition situations where the debtor's slide toward bankruptcy is not widely perceived or thought to be imminent, or where the filing is precipitated by adverse events occurring after the disputed transfer, in this case the fact that TWA was headed for the bankruptcy court was a matter of public knowledge for many months prior to the subject transfer. Furthermore, it was a matter of public knowledge that TWA's operations could not, on a long-term basis, service its debt. Large blocks of debt holders confirmed that fact by agreeing to work with TWA to effect a major debt restructuring in which the debt holders would give up claims aggregating $1 billion. As I see it, in November 1991 there were only two possibilities: (1) TWA could file for Chapter 11 (or do an out of court restructuring) and salvage its business by having the creditors take a major "hit" along the lines of the preliminary pre-packaged deal; or (2) it could have let the creditors dismantle the company and take foreclosure sale values for a greater "hit". In either event, it was a foregone conclusion that the creditors were going to receive substantially less than a 100% recovery. Nevertheless, Travellers argues that TWA was merely experiencing a short-term liquidity problem and Travellers' expert's appraisal of the asset values shows that the creditors were foolish in accepting less than a 100% recovery on their claims. Travellers' view of the situation is fundamentally at odds with how informed businesspersons were viewing it in November 1991. I believe the informed businesspersons were, in effect, acknowledging that TWA's liabilities exceeded the value of its assets at fair valuation. I find that that market based judgment supports the conclusion I reach based on the analysis discussed above.[40]

I make one final observation. In contrasting Travellers' position that the value of assets exceeded the liabilities by more than $1.7 billion with the fact that under the Plan TWA's shareholders received nothing and TWA's general unsecured creditors received only 20% of their claims, TWA asks: if Travellers is to be believed, then what happened to this huge reserve of alleged excess value? Pl.Br. 1. Travellers responds that that value was distributed to TWA's creditors and employees in the form of stock of the reorganized company. Def.Reply Br. 1. I do not find this response very helpful to Travellers' position. Indeed, I believe it undermines their position. First, it is no answer to the issue raised in a preference proceeding that whereas the target creditor received cash it is okay because the other creditors received stock. That is not what the creditors bargained for when they extended credit to the debtor, and the purpose of § 547(b) is to ensure that all similarly situated creditors are treated equally. Second, the value of what TWA's unsecured creditors received in stock (and notes) was substantially less than the amount of their claims.

------------------

TWA's counsel should present an order on notice.

---

**40.** I illustrate this point with specific numbers as follows. According to Travellers, the value of TWA assets was $5,742,143,000 (excluding the $965 million value for aircraft on order) and TWA's total liabilities were $3,992,969,000 (excluding the $965 million liability associated with the aircraft on order). If publicly traded debt were counted at face value rather than on the basis of market quotes, the liability figure increases by $927,925,000 ($1,237,494,000 − $309,519,000), bringing the total liabilities to $4,920,894,000. Thus, the value of the assets still exceeds the liabilities. Yet, according to Travellers' calculations, the aggregate face amount of publicly traded debt of $1,237,444,000 (excluding the original issue discount) was only worth $309,519,000, a 75% discount. Why would the market so severely discount the value of TWA? The answer, of course, is that the market did not value TWA at anywhere near Travellers' figure. I find the market's assessment was one of insolvency.